**CRONIN'S ESTATE et al. v. COMMISSIONER OF INTERNAL REVENUE.**

No. 10476.

Circuit Court of Appeals, Sixth Circuit.

Dec. 3, 1947.

---

[3] Ollert v. Ziebell, 1921, 96 N.J.L. 210, 114 A. 356.

[4] Anzano v. Metropolitan Life Insurance Co., 3 Cir., 1941, 118 F.2d 430, 435.

William C. Allee, of Detroit, Mich., (William C. Allee and Havelock J. Northmore, both of Detroit, Mich., on the brief), for petitioners.

Carlton Fox, of Washington, D. C. (Theron L. Caudle, Sewall Key, Lee A. Jackson, and Carlton Fox, all of Washington, D. C., on the brief), for respondent.

Before HICKS, SIMONS, and MARTIN, Circuit Judges.

SIMONS, Circuit Judge.

The principal question raised by the petition for review is whether the decedent who died in 1940, transferred to his wife in 1935 life insurance policies in contemplation of death within the meaning of § 811(c) of the Internal Revenue Code, 26 U.S.C.A. Int.Rev.Code, § 811(c), so as to require including them in his estate in computing the estate tax. Subordinate questions involve the value of an apartment building belonging to the estate, and whether penalties asserted by the ·respondent

under the provisions of § 3612(d) for failure to file a timely estate tax return, should be remitted on the ground that ignorance of the law was a reasonable cause for the failure. The respondent determined a deficiency of $35,042.77, added to it a penalty of $8,760.69, and the Tax Court redetermined the deficiency in the amount asserted, reserving for recomputation of both tax and penalty an allowance of credit for state inheritance tax if and when applied for and proved, according to law.

The decedent died on April 5, 1940 at the age of 57. Surviving him were his widow, the petitioner Irene Cronin, who was appointed executrix of his estate and five children. The estate tax return was filed with the Collector on January 1, 1942, without a timely application for extension. During 1935 the decedent assigned to his wife 17 life insurance policies, the net value of which, at the time of his death, was $341,546.63, subject to liens of the National Bank of Detroit on account of loans upon the policies. The assignments, in varying phrasing, purported to transfer all rights of the insured as owner, beneficiary or assignee, preserved to him by the policies, and all money, interest, benefit or advantage due or to become due to him. Thereafter the premiums on the policies were paid by Mrs. Cronin either from her own funds or from money borrowed on the policies. At the time of the assignments Irene Cronin was the designated primary beneficiary, though some of the policies designated the decedent's children as contingent beneficiaries. After the date of the assignments the assignee directed that the proceeds from five policies be retained by the insurers and the interest thereon paid to her in monthly installments, and that after her death the proceeds be divided in equal portions for each surviving child. The decedent likewise directed one of the insurers to distribute the proceeds of its policies in similar manner in the event that his wife should not survive him. On October 22, 1935, subsequent to the assignment of most of the policies, the decedent executed a will leaving the residue of his estate to his wife but providing that, in the event she predeceased him, it was to be held in separate and equal trusts for the benefit of each surviving child.

■ For the motive that impelled the decedent to transfer the insurance policies to his wife, we look not only to evidence having a direct bearing thereon, but to the attendant circumstances. The decedent was the dominant stockholder in the Pine Ridge Coal Company, holding 50% of its stock. The remainder, except for a few qualifying shares, were owned by his wife. The corporation, during 1935 and prior thereto, had a very profitable cost-plus contract with the D. & C. Navigation Company for supplying coal to its boats. This contract was to terminate on December 31, 1935, though a similar arrangement on a month to month basis was thereafter made and the contract was not finally terminated until the end of 1937. In August of 1935 the Coal Company's lighter was condemned as unseaworthy, necessitating the purchase of a new boat and its conversion, at a cost of approximately $65,000. The Coal Company required a dock and loading facilities for its operations. It had been using a dock under lease from the Grand Trunk Railroad Company, which was to expire on January 1, 1936, without expectation of renewal. The corporation, therefore, purchased another dock for $137,000 and converted it to coal operations. These several outlays were beyond the company's power to finance, through liquid resources, and it became necessary to mortgage its assets.

The Tax Court found that prior to and during 1935 decedent was in normal health for a man of his age, active in his business and moderate in eating and drinking habits. His health did not perceptively begin failing until the latter part of 1939, and death resulted from coronary thrombosis after a short illness. It also found that at the time he transferred the insurance policies he was aware of and concerned about the financial problems facing the Coal Company, and realized that by irrevocably transferring them to his wife he made it impossible for himself to assign such policies to the Coal Company or otherwise subjecting them, by his own actions, to

the hazards of his business. It nevertheless found that this realization was not the dominant motive affecting the transfers and concluded, three judges dissenting, that record evidence affirmatively established that the policies were transferred by him in contemplation of death.

■ It is perhaps trite to say that every case involving a close question and distinguished in some aspects from established precedents, must be decided upon its own facts. The observation, however, is peculiarly applicable when the legal issue is whether ultimate findings and conclusions are sustained by substantial evidence, and involves so abstract and baffling a concept as "in contemplation of death." Ever since decision in United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867, the rationalization of the concept there undertaken has been accepted as authority. In reliance thereon it was said, in City Bank Farmers Trust Co. v. McGowan, 2 Cir., 142 F.2d 599, 602. "It covers 'substitutes ̇ for testamentary dispositions.' If they are such 'substitutes,' the test is the donor's motive * * * moreover even though they be 'substitutes' and the motive be of that 'sort,' the donor must not be also actuated by a 'dominant motive of some other kind * * *." In Allen v. Trust Company of Georgia et al. 326 U.S. 630, 66 S.Ct. 389, 391, 90 L.Ed. 367, it was said that the statute is satisfied "where for any reason the decedent becomes concerned about what will happen to his property at his death and as a result takes action to control or in some manner affect its devolution." It was reasoned that the transfer is made in contemplation of death if the thought of death is its compelling cause, citing City Bank Farmers Trust Co. v. McGowan, 323 U.S. 594, 599, 65 S.Ct. 496, 89 L.Ed. 483, but as Mr. Justice Douglas points out, "every man making a gift knows that what he gives away today will not be included in his estate when he dies. All such gifts are not made in contemplation of death in the statutory sense. Many gifts, even to those who are the normal and appropriate objects of the donor's bounty, are motivated by purposes associated with life,

rather than with the distribution of property in anticipation of death, and there may be the desire to recognize special needs or exigencies or to discharge moral obligations. The gratification of such desires may be a more compelling motive than any thought of death."

With this rationalization of the statutory provision, we come to a consideration of the record and findings. The decedent was 53 years old and his physician had found him to be an extremely active man in perfect health. He faced a critical period in his affairs. He was about to lose, at least so he thought, a profitable contract, upon which the earlier prosperity of his business depended, and to lose the docking facilities necessary for its operation. His corporation had made commitments which necessitated the mortgaging of its assets and the enterprise had entered a speculative phase at a time when the country was still in the midst of a devastating economic depression. This gave him grave concern, as the Tax Court indeed found, upon evidence of his confidential secretary, whose testimony was accepted as credible. His principal personal asset was his life insurance. The policies had substantial value and had frequently been used as collateral for loans to meet the demands of his business. What was their fair value at that time is not disclosed by the record, but that it was sufficiently large to give his family financial security in the event of his business failure, is clearly demonstrated by bank records which indicate loans upon them aggregating, at the time of his death, almost $100,000.

■■ The Tax Court said it was not convinced by the evidence that the decedent's business was of such kind or was at such a juncture as to prompt the decedent to make the transfers predominantly for protective reasons, and even if so, such purpose is neither inconsistent with nor hostile to the desire to make a testamentary disposition. Undoubtedly a desire to make a testamentary disposition may well include a desire to protect the subject matter of the disposition. The Tax Court was, however, required to consider the motive of the decedent at the time

and under the circumstances in which he found himself in 1935, rather than current knowledge retrospectively applied. That Cronin, after several years of limited activity for his corporation, was able subsequently to make a profitable contract with the City of Detroit for the utilization of his facilities in the carriage of refuse, has no bearing whatsoever upon the motivation of assignments made in 1935.

■ It was significant to the Tax Court that the subject matter of the transfers were themselves inherently testamentary in nature, and that characteristic, it thought, may not altogether be ignored as throwing light on the motive actuating the transfers. To this we agree, and agree also with its view that the testamentary nature of the thing transferred does not necessarily mean that the motive actuating the transfer is likewise testamentary in nature. It must be considered, however, that the policies had great present value, constituted Cronin's principal personal asset and that he was deeply concerned about the future of his business and the financial security of his wife and children. What, then, was his dominating purpose? He knew, of course, that some day he would die and his family would collect his insurance, if he continued to carry it, but was without fear of early decease, if that is important. Even so, it is an aspect of human nature that may not be ignored, that the fear of events that impend and seem imminent, overrides apprehension of a contingency that however certain seems remote.

■ We are fully aware that it is for the Tax Court and not for us to draw inferences from established facts. Such inferences must, however, be reasonable to satisfy the substantial evidence test. The decedent's concern over the critical aspects of his business is fully established by direct evidence. The finding that what he did to protect his family was motivated predominantly by a testamentary purpose, rests entirely upon an inference that no real benefit or enjoyment was intended to be realized from his transfer of insurance until his death. Where a donor's purpose is to escape estate taxes, no other purpose appearing, the inference arises that the gift is a substitute for and so equivalent to a testamentary disposition. Updike v. Com'r, 8 Cir., 88 F.2d 807; Vanderlip v. Com'r, 2 Cir., 155 F.2d 152; First Trust & Deposit Co. v. Shaughnessy, 2 Cir., 134 F.2d 940, and where it is clear that it is to forestall a devolution which otherwise could become effective only upon death, the gift is likewise testamentary. Such was our case of Kroger v. Com'r, 6 Cir., 145 F.2d 901, but it is not this. There is, in the present case, no scintilla of evidence that the decedent's motive was to escape taxes. Though concern over taxes, if proved, may of itself sustain an inference that an inter vivos gift is a substitute for testamentary disposition, no other purpose appearing, First Trust & Deposit Co. v. Shaughnessy, supra, yet to infer a purpose to make a testamentary disposition, from a purpose to avoid taxation, which is itself but the product of inference, is to indulge in that superimposition of inferences one upon another so abhorrent to American law.

■ The Tax Court was of the view that the rights acquired by the decedent's wife other than the right to collect the proceeds of the policies at death, were not intended to be exercised or enjoyed during the decedent's lifetime, except insofar as necessary to preserve and enhance ultimate rights. There is no evidence, however, of such intention. The fact that Mrs. Cronin paid the insurance premiums partly out of the avails of loans upon the policies, does not sustain an inference that such was the purpose of the assignment. Cronin's fears in respect to the future of his business, proved unfounded. Had they materialized there was nothing to prevent Mrs. Cronin from utilizing the loan or cash surrender value of the policies for the maintenance of herself and family. Indeed, there is evidence that in one instance, at least, she entered upon an independent transaction in Canada with funds provided, in final analysis, by a policy loan. Moreover, she used her own funds to the extent available for the payment of premiums. This aside, however,

we think it may not, in truth, be said that financial security residing in complete control of loan and surrender value is not present enjoyment of the subject matter of a gift, even though its actual utilization may prove to be unnecessary.

 The next question to be decided is the valuation placed by the respondent upon an apartment house owned by Cronin at the time of death. It was included in the decedent's estate tax return at a value of $30,000. The Commissioner increased this value to $45,000 and the Tax Court affirmed. The only evidence bearing on value was the opinion of one witness who, while experienced in Detroit real estate, was neither a licensed real estate operator nor a professional appraiser. His testimony was vague and general. The court was not informed as to the basis or method of calculation relied upon, the type of construction involved, the date when the apartment was built, nor its cost. No information was furnished as to its operating and maintenance cost, and so no basis laid for determining the net income of the property. In this situation the court, we think, was not obliged to accept this evidence as overriding the presumption of correctness that attaches to the Commissioner's determination. Tracy v. Com'r, 6 Cir., 53 F.2d 575; Grand Rapids Store Equipment Corp. v. Com'r, 6 Cir., 59 F.2d 914; Brown v. Com'r, 6 Cir., 94 F.2d 101.

The respondent added a 25% penalty for failure to file the estate tax return within the time prescribed by law. It was not filed until 15 months from the date of death. Section 3612(d) of the Internal Revenue Code permits the avoidance of a penalty when the delinquency is due to reasonable cause and not willful neglect. The petitioner contends that because her attorney did not know there was a statutory time limit for the filing of the return, and because there was a delay in assembling the necessary data owing to the illness of decedent's secretary, the delay was due to reasonable cause. Administrative necessity would seem to require that returns be filed promptly and the statutory penalty is undoubtedly designed to meet the needs of the Treasury through prompt tax assessment and collection. It is easy to see what abuses would result if the time limit provision could, in every case, be escaped merely by the assertion that the taxpayer or his counsel was not aware of the limitation. When valid reasons for delay exist an extension of time may be granted. No such extension was here applied for. The assessment of the penalty was not invalid although the amount will have to be recomputed upon a recomputation of the tax deficiency.

We hold that there was no substantial evidence to sustain the deficiency insofar as it was based upon the fair value of the insurance policies. The decision of the Tax Court is reversed and the case remanded for a recomputation of the tax and penalty in accordance with the views herein expressed.