The DETROIT BANK & TRUST COM-
PANY, Executor of the Estate of Fred
W. Ritter, Deceased, Plaintiff,

v.

UNITED STATES of America,
Defendant.

Civ. A. No. 33075.

United States District Court,
E. D. Michigan, S. D.

Jan. 17, 1974.

James F. Kennedy, Jr., Marshall, Mel-
horn, Bloch & Belt, Toledo, Ohio, K. G.
Kersten, Flat Rock, Mich., for plaintiff.

Don Fish, Tax Div., Refund Trial
Section 1, U. S. Dept. of Justice, Wash-
ington, D. C., Fred Mester, Asst. U. S.
Atty., Detroit, Mich., for defendant.

## OPINION

FREEMAN, District Judge.

This is an action instituted pursuant
to 28 U.S.C. § 1346(a)(1) for the recov-
ery of internal revenue taxes alleged to
have been erroneously assessed against,
and collected from, the decedent's estate.
The facts are as follows.

On April 9, 1964, plaintiff's decedent
entered into an irrevocable trust agree-
ment with The Detroit Bank & Trust
Company as Trustee, under the terms of
which the Trustee was required to ob-
tain and hold insurance on the life of
the decedent. All right, title and inter-
est to the life insurance policy or poli-
cies so acquired were to vest immediate-
ly in the Trustee. Upon the decedent's
death, the trust was to be divided into
two equal parts, one to be distributed to
the decedent's son, and the other to be
held in trust for the benefit of the dece-
dent's daughter.

At the time the trust was created, the decedent transferred $9,600.00 to its corpus to be used in acquiring the insurance on his life. Pursuant to the terms of the trust, the Trustee then used $9,552.00 of the trust corpus to obtain a life insurance policy in the amount of $100,000.00 on the life of the decedent.

The federal estate tax return disclosed the trust, its terms, and the $100,000.00 life insurance policy owned by the Trustee, but excluded the value of the policy from decedent's gross estate. After an audit, the Internal Revenue Service included the policy proceeds in decedent's gross estate and assessed an estate tax deficiency of $28,377.37 relating to this inclusion. The amount of that deficiency, plus interest of $3,111.24, was collected by the District Director of Internal Revenue. Plaintiff contends that this assessment and collection of the tax deficiency and interest was erroneous and seeks a refund of $31,487.61, as well as statutory interest from the date of payment to the Internal Revenue Service.

This case is now before the court on remand from the Sixth Circuit Court of Appeals, which in Detroit Bank & Trust Company v. United States, 467 F.2d 964, reversed a decision of this court granting summary judgment in favor of the plaintiff holding that, even if decedent's transfer of the $9,600.00 to the irrevocable trust was made in contemplation of death, the amount to be included in decedent's estate for estate tax purposes should be limited to the $9,600.00 and should not include the $100,000.00 proceeds of the insurance policy. The Court of Appeals, however, reversed, holding that the valuation of the transfer, for estate tax purposes, should be $100,000.00.

For the purpose of the summary judgment motion only, plaintiff conceded that the $9,600.00 transfer was made in contemplation of death. However, on remand this court must decide on the merits whether or not that transfer, in connection with the setting up of the irrevocable insurance trust, constituted a transaction in contemplation of death under 26 USC § 2035. The resolution of this issue involves a determination of decedent's primary motive in setting up and funding the irrevocable trust in question.

The facts relating to decedent's motivation are as follows. On the date of the transaction in issue, April 9, 1964, decedent, Fred W. Ritter, was one of four shareholders in F. W. Ritter & Sons Company. The other shareholders were Fred's brothers, William and Henry, both older than he, and his son George. The number of shares held by each as of April 9, 1964, is shown by the following table:

| Shareholder | No. of Shares Held | % of Total Outstanding |
|---|---|---|
| Fred W. Ritter | 10,208½ | 20.83+% |
| William Ritter | 12,250 | 25.00 % |
| Henry Ritter | 16,333 | 33.33+% |
| George H. Ritter | 10,208½ | 20.83+% |
| Total Outstanding | 49,000 | 100% |

The shareholders were all active in the business, which had been started by decedent's father in 1893. George was the only one in the family of his generation who was involved in the business. The company was engaged in the manufacture of clay pottery.

In the fall of 1962, a serious internal problem developed in the corporation. Henry Ritter, due to his erratic behavior, was causing numerous problems in the operation and affairs of the business. He was an alcoholic. There were many incidents involving his interference with the other members of the business in the conduct of their corporate and managerial responsibilities. Some of these incidents are detailed in the testimony.

Henry's behavior caused not only embarrassment to the other shareholders in the business, but also precipitated serious corporate problems. One such problem involved the company's ill-advised purchase of a plastics company which purchase was initiated by Henry. This was done over George's objection. Such actions by Henry, often taken without

consulting the others, engulfed the corporation in difficult financial and legal problems.

The problems caused by Henry came to a head in the fall of 1962, at least for decedent's son, George. In his words: "It really came to the point where I felt that my father and I spent more time trying to straighten out the difficulties we were experiencing through Henry's effort than we were in conducting the normal business of the company . . . it was to the point that it was almost untenable to live with the conditions that existed, with Henry operating the way he was."

George discussed with three other people his dissatisfaction with conditions at the company. The first person he talked to was Herb Keller, an employee of the Keller Pottery Company of Pennsylvania. Mr. Keller told him that if his situation became untenable, there might be a place for him with the Keller Company.

Then in late 1962 George spoke with Richard S. Cole, an attorney and legal adviser to the Ritter company. He expressed his concern with the state of corporate affairs caused by Henry's abuses, and he indicated that something would have to be done about the problem.

George also met with his father and told him that ". . . unless there were some action taken to put Henry in a position where he could be controlled, that I didn't know whether I was going to be able to stay with the company or not." At this time George also mentioned that there might be a position open with the Keller Company. The mention of this prospect, in George's words, ". . . very visibly upset my father."

After this last discussion, Fred Ritter met with Richard Cole, the attorney, in January of 1963. Fred spoke of his fear that George was going to leave the company. He stated that he wanted to do everything he could to keep his son from leaving. In this connection, Fred informed Cole that he wanted to prepare a will to provide that George would get all of his stock in the Ritter companies. As related in Cole's testimony, Fred wanted some means of going to George to persuade him to stay with the company with the assurance that he would get Fred's stock and someday control the company.

This was not to be a simple matter, however. Fred also had a daughter, Ramona, and he wanted his estate divided equally between her and George. For personal reasons he wanted his daughter's half to be in trust. George was to get his half outright. If Fred's stock comprised more than half his estate, the remainder was to go into the testamentary trust for Ramona. However, Fred wanted George to able to vote that stock and to have the right to purchase it.

Pursuant to the above discussion, Mr. Cole drafted a will and the beneficiary provisions of the testamentary trust and sent copies to Fred for his review. Final drafts of the will and testamentary trust were prepared by July of 1963. They were ultimately executed by decedent on October 1, 1963. The trustee of the testamentary trust was The Detroit Bank & Trust Company. George was given the right to purchase, at book value, such stock as would go into his sister's testamentary trust.

Some time after the first meeting between George and his father, described above, they had another conversation. By this time Fred had a copy of the will that Mr. Cole had drafted for him and which was later executed. He showed it to George, who pointed out the likelihood that Fred's stock interest in the company would constitute far more than half of Fred's estate. He asked where he would get the money to purchase the stock from the testamentary trust in order to end up with all his father's stock. At this meeting Fred related to George a conversation he had had with William Ritter, the oldest of the three brothers. William had said that if anything should

happen to him, the surviving shareholders would be entitled to purchase equal shares of his stock from his estate.

After this meeting, Fred became increasingly concerned about the problem of lack of liquidity in his estate. He discussed this with Mr. Cole and a Mr. Park of The Detroit Bank & Trust Company on October 1, 1963 when he executed his will and testamentary trust. Fred then consulted with Mr. Cole about how to solve the liquidity problem. Mr. Cole brought in a tax man from his office.

The solution finally arrived at was the creation of the irrevocable trust which procured a life insurance policy of $100,000.00 on Fred's life. The relevant terms of this trust, described above, were such as to provide George with approximately $50,000.00 in cash with which he could purchase Fred's stock from the testamentary trust. Fred transferred $9,600.00 to the trust corpus so the trust could purchase the $100,000.00 policy on his life as previously mentioned.

The irrevocable trust was created and the $9,600.00 transferred to it on April 9, 1964. At that time Fred was 65 years of age. It is stipulated by the parties that Fred, in establishing and funding the irrevocable trust, was not motivated by any concern for his health. He died on October 6, 1964, shortly after his 66th birthday, and about five months after the creation of the irrevocable trust.

26 U.S.C. § 2035, entitled "Transactions in contemplation of death", provides:

(a) *General rule.*—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer . . . by trust or otherwise, in contemplation of his death.

(b) *Application of general rule.*—If the decedent within a period of 3 years ending with the date of his death . . . transferred an interest in property, . . . such transfer . . . shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section . . . .

The Treasury Regulations on Estate Tax, 26 C.F.R. § 20.2035–1, Transactions in contemplation of death, provide in part:

(c) *Definition.*—The phrase "in contemplation of death", as used in this section, does not have reference to that general expectation of death such as all persons entertain. On the other hand, its meaning is not restricted to an apprehension that death is imminent or near. A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. The bodily and mental condition of the decedent and all other attendant facts and circumstances are to be scrutinized in order to determine whether or not such thought prompted the disposition.

■ Decedent created and funded the irrevocable trust in issue within three years of his death. So, under § 2035 there arises a rebuttable presumption that that transaction was made in contemplation of death. Plaintiff seeks to rebut this presumption. To prevail, plaintiff must show by a preponderance of the evidence that when decedent created the irrevocable trust and transferred money to it, this transfer was not in contemplation of death.

Plaintiff contends that decedent's dominant motive in setting up the irrevocable trust and transferring money to it was a life motive, that is, to persuade his son to stay on with the Ritter com-

pany. Plaintiff argues that the primary method by which Fred sought to do this was to give assurance to his son that he would someday control the company. The irrevocable trust transaction, it is asserted, was designed to help provide such assurance and so further decedent's goal of keeping his son with the company.

Defendant, on the other hand, contends that the transaction in question was a substitute for a testamentary disposition and so a transfer made in contemplation of death. Defendant argues that the transaction was part of an overall testamentary plan because designed to provide for his issue after death. Defendant emphasizes that 1) the irrevocable insurance trust was testamentary in nature because the benefits arising thereunder were to accrue upon decedent's death, and 2) the beneficiary provisions of the irrevocable trust, which was made after the will, were the same as those in the will, to wit: the proceeds were to be divided between the son and daughter in equal shares, the daughter's share to be in trust.

In cases under § 2035, the proper inquiry is whether, when the transfer in question was made, the dominant motive of the decedent was a life motive or a death motive. "Phrased somewhat differently, the question is whether the decedent made this gift for a purpose which would reasonably be effected during the life of the decedent, or is the gift a substitute for a testamentary disposition." Lockwood v. United States, 181 F.Supp. 748, 750 (S.D.N.Y., 1958), citing United States v. Wells, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931). For the reasons stated below, this court agrees with plaintiff that decedent's primary, impelling motive for making the subject transfer was to keep his son from leaving the company and that that motive was a life motive.

As the facts show, beginning in late 1962, George Ritter was seriously considering leaving the Ritter family business because of the nearly intolerable situation created by Henry. When Fred, George's father, learned of this, he was greatly troubled. He wanted George to stay with the company. He tried to persuade George to stay by giving him concrete assurances that he could someday have a controlling stock interest in the pottery company. The rationale behind Fred's efforts was to give George incentive to put up with the trials caused by Henry.

The initial means which Fred devised to assure George of eventual control consisted of preparing the will and testamentary trust described above. Fred showed these to George and told George of William's plans for his own stock on his death so George could see how he might end up with a majority stock interest.

George, however, was not satisfied with these assurances. He foresaw that in order to end up with all his father's stock he would have to purchase much of it from the testamentary trust. He complained that he did not have the money to do that.

Fred thereupon consulted with his advisers to try and come up with some way to provide that George would have money to purchase stock from the testamentary trust. The solution arrived at was the irrevocable insurance trust. By this means, when Fred died and the irrevocable trust collected the insurance on his life, George would get approximately $50,000.00 in cash with which to purchase stock from the testamentary trust.

The irrevocable trust, in a sense, did supplement decedent's will and testamentary trust arrangement. However, the timing of the preparation of all of these documents, the circumstances of their preparation, and the provisions contained therein, together constitute persuasive evidence that all were prepared and designed for a predominant living purpose—to persuade George to stay with F. W. Ritter & Sons. Fred,

though 65 years of age, apparently did not make a will until his son was thinking of leaving the family business. Then he made a will and testamentary trust designed, insofar as was consistent with his desire to treat both his children equally, to give his son some assurance of a future with the company. When this proved not enough to assure his son, he prepared the irrevocable trust. The provisions of this trust do reflect decedent's desire to treat his offspring equally. Still, the motive actuating the formation of this irrevocable trust was decedent's fear that his son might soon leave the company unless more was done to assure him of ultimate control. This was an immediate lifetime motive.

This conclusion is supported by Hull's Estate v. C. I. R., 325 F.2d 367 (3 Cir. 1963). Decedent Hull died in 1957 at the age of 72. He was survived by his wife and three daughters. His will, made in 1950, provided that the bulk of his estate was to be held in trust for his wife for her life with the remainder to go to his three daughters equally. In 1954, within three years of his death, decedent made a gratuitous transfer of full ownership rights on 15 policies of insurance on his own life to his three daughters equally. The Commissioners of Internal Revenue sought to include this transfer in decedent's gross estate as a transfer in contemplation of death. The Third Circuit Court of Appeals noted that the transfer of the policies to decedent's daughters reflected in part the distribution provisions of his will. However, there was evidence which showed that decedent transferred the policies primarily to give peace of mind and an immediate sense of security to a recently divorced daughter who felt emotionally and financially insecure. The transfer to his other two daughters was made in accord with his wish and practice to treat his daughters alike. The Court held that the dominant motive for the transfer was a life motive and that the transfer was not in contemplation of death.

In the present case, as in *Hull's Estate*, supra, the transfer in question does have certain earmarks of a testamentary disposition. The transfer involved insurance, the benefits of which accrue on decedent's death. Also, the provisions for ultimate distribution of the transfer are the same as found in decedent's will. Nevertheless, the motive which impelled the setting up of the trust and transfer of $9,600.00 to it was an immediate lifetime motive—the desire of decedent to keep his son with the company. This was Fred Ritter's principal motive, not a desire to avoid estate taxes.

In addition to Hull's Estate, supra, there are numerous reported cases in which courts have found transfers of life insurance to the natural objects of a decedent's bounty to have been life motivated. Such cases include Lockwood v. United States, 181 F.Supp. 748 (S.D.N. Y., 1958), Cronin's Estate v. Commissioners of Internal Revenue, 164 F.2d 561 (6 Cir. 1947), and Landorf v. United States, 408 F.2d 461, 187 Ct.Cl. 99 (1969).

Under the circumstances of this case, this court concludes that decedent's dominant motive in setting up and funding the irrevocable trust was a life motive. Therefore, the proceeds of the insurance policy held by the trust are not includible in decedent's gross estate under § 2035.

An appropriate form of judgment shall be submitted.