ESTATE OF LOUIS ZAIGER, DECEASED, BEATRICE ZAIGER, EXECUTRIX, MARION LAPPIN, EXECUTRIX, AND ROBERT I. LAPPIN, EXECUTOR, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BEATRICE ZAIGER, PETITIONER v. COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket Nos. 4981-68, 5442-71, 5443-71.    Filed August 25, 1975.

*M. Gordon Ehrlich, John H. Ashby,* and *John S. Brown,* for the petitioners.

*Barry J. Laterman,* for the respondent.

GOFFE, *Judge:* The Commissioner determined deficiencies in petitioners' Federal estate and gift taxes as follows:

| Petitioner | Docket No. | Tax | Year | Deficiency | Total deficiency |
|---|---|---|---|---|---|
| Estate of Louis Zaiger ____ | 4981-68 | Estate | 1964 | | $472,271.75 |
| Estate of Louis Zaiger ____ | 5442-71 | Gift | 1947 | $31.68 | |
| | | | 1948 | 20.20 | |
| | | | 1949 | 24.70 | |
| | | | 1950 | 20.98 | |
| | | | 1951 | 246.04 | |
| | | | 1952 | 101.74 | |
| | | | 1954 | 289.09 | |
| | | | 1956 | 423.03 | |
| | | | 1957 | 1,456.55 | |
| | | | 1958 | 675.00 | |
| | | | 1964 | 13,279.00 | 16,568.01 |
| Beatrice Zaiger ____ | 5443-71 | Gift | 1964 | 10,028.00 | |
| | | | 1965 | 46,680.00 | 56,708.00 |

The cases were consolidated for trial, briefs, and opinion. The parties resolved many of the issues prior to trial. The issues remaining for decision are whether transfers of cash by decedent's wife from their joint checking account and transfers of stock by decedent were gifts in contemplation of death, and the fair market value of voting trust certificates of closely held family corporations for gift tax and estate tax purposes.

### FINDINGS OF FACT

The petitioners in docket Nos. 4981-68 and 5442-71, Beatrice Zaiger, Marion Lappin, and Robert I. Lappin, were the duly appointed executrices and executor of the Estate of Louis Zaiger and had their principal office in Swampscott, Mass., at the time the petitions were filed. Beatrice Zaiger, the petitioner in docket No. 5443-71, resided in Lynn, Mass., at the time her petition was filed. Louis Zaiger (hereinafter referred to as decedent) died testate on May 14, 1964, a resident of Swampscott, Mass., and the Federal estate tax return for his estate was filed with the District Director of Internal Revenue, Boston, Mass. Petitioner Beatrice Zaiger is Louis Zaiger's surviving wife. Marion Lappin is the decedent's daughter and Robert I. Lappin is the husband of Marion Lappin.

Decedent and his wife, Beatrice Zaiger, always maintained a joint bank account into which they deposited all receipts. Mrs. Zaiger handled all of the personal funds of the decedent and herself. She was a joint owner with decedent of real estate prior to 1962 which produced substantial sums of rental income which were deposited into their joint bank account.

Prior to the death of Mr. Zaiger, his wife withdrew the following amounts from the joint checking account without his knowledge:

| Year | Amount withdrawn |
|------|------------------|
| 1962 | $1,025 |
| 1962 | 5,000 |
| 1963 | 7,500 |
| 1963 | 7,500 |
| 1963 | 8,000 |
| | 29,025 |

The amounts withdrawn were deposited by Mrs. Zaiger in her separate savings accounts in various banks. She considered the funds withdrawn to be her money.

The decedent filed Federal gift tax returns for the years 1962 and 1963 which Mrs. Zaiger executed as consenting to being taxed on one-half of the gifts to third parties. The decedent did not report the withdrawn funds as gifts to Mrs. Zaiger on such returns.

At the date of decedent's death, he and his surviving wife owned the following assets as joint tenants which had the indicated values for estate tax purposes:

| | |
|---|---:|
| House and land at: 25 Atlantic Ave., Swampscott, Mass. (personal residence) | $45,000.00 |
| Savings account, Essex Trust Co. | 453.55 |
| Checking account, Essex Trust Co. | 12,733.68 |
| State of Israel bonds | 15,688.75 |
| U.S. series E bonds | 39,421.88 |
| Total | 113,297.86 |

In his statutory notice of deficiency, the Commissioner determined that the funds withdrawn from the joint bank account constituted gifts in contemplation of death and were includable in decedent's gross estate.

Decedent owned all of the issued and outstanding stock of Signal Manufacturing Co. for some time prior to 1948. In 1946, his son-in-law, Robert I. Lappin, was employed by Signal. Lappin's first position with Signal was in the tool and die department and shortly thereafter he was placed in charge of the purchasing department. He became active in the production activities of Signal. Lappin was elected as an officer of Signal in 1949 and was elected president in 1950. Lappin's understanding with decedent was that if Lappin did a good job and brought growth and success to the business, he would be rewarded by a substantial ownership of the business. The decedent transferred as gifts the following shares to Lappin and his wife (decedent's daughter):

| Date | Number of shares |
|---|---:|
| 8/3/48 | 16 |
| 7/7/49 | 10 |
| 12/11/50 | 4 |
| 9/25/51 | 24 |
| 9/25/52 | 24 |

In 1953, Lappin felt that his performance at Signal warranted a more substantial ownership so he suggested to decedent that more shares be transferred to him. In that year, decedent transferred 288 shares to Lappin and his wife. As a result of all the transfers made by decedent, at the end of 1953 decedent held only 52 percent of the outstanding stock of Signal and was reluctant to relinquish control although he recognized his obligation to continue to transfer the stock to Lappin.

In 1958, Lappin requested the decedent to give him more control over the business and decedent and his wife together transferred 8 shares to the Lappins in each of the years 1959 and 1960. These transfers left decedent with 51.13 percent of the outstanding stock.

In 1960, the shareholders of Signal created a voting trust which gave decedent and Lappin each 50 percent of the control of Signal.

In 1961, decedent gave voting trust certificates of Signal representing 8 shares to the Lappins which reduced his beneficial ownership in the corporation to 50.72 percent. In 1962, decedent and his accountant discussed gifts of additional shares to the Lappins. The accountant convinced decedent that the voting trust assured decedent of 50-percent control of Signal and such control would not be diminished if decedent gave additional shares to the Lappins. Decedent, in 1962, gave to the Lappins voting trust certificates representing 16 shares of Signal.

In 1963 and 1964, decedent gave voting trust certificates representing 50 shares of Signal in each year, 20 of which were given to the Lappins and the remaining 30 to a trust for the Lappins' children (decedent's grandchildren). Decedent's accountant recommended to decedent the pattern of giving voting certificates representing 10 shares each to Mr. and Mrs. Lappin in 1962, 1963, and 1964 and the accountant believed the pattern would have continued had not Mr. Zaiger died in 1964.

The decedent suffered from various infirmities and illnesses dating back to 1943. In March 1959 he had a stroke from which he, in due time, completely recovered. During his period of recovery, he returned to his business activities in a wheelchair until he could resume walking. During periods of illness, decedent was active in the management of his business affairs and while confined to the hospital, he consulted with Mr. Lappin each

evening as to the business affairs of Signal. In September 1961, decedent suffered a heart attack and while hospitalized his doctor suspected lung cancer but, because of his heart condition, such possibility was not further explored nor was decedent informed of the possibility.

In March 1963, decedent was hospitalized for diabetes which was brought under control by insulin injections. In July 1963, decedent was hospitalized for acute pancreatitis and in February 1964, for acute colitis. In April 1964, decedent was hospitalized for severe breathing problems. He died on May 14, 1964, and the final diagnosis was pleural effusion right, carcinoma of the lung, arteriosclerotic heart disease, old posterior lateral wall infarction, and diabetes mellitus.

Decedent had a superficial understanding of medical illnesses and also possessed great faith in what a doctor could do for him. When he was ill, he expected to get better and he endured his many illnesses in a most stoic manner. Upon recovery from the traumatic episodes of bad health, the decedent would regain his jovial personality. The possibility of his dying was not on Mr. Zaiger's mind.

Decedent executed his will on September 2, 1959, and executed codicils to that will on April 5, 1960, and on December 14, 1963.

Decedent filed Federal gift tax returns for the taxable years 1953 and 1959 through 1963, inclusive, with the District Director of Internal Revenue, Boston, Mass. A Federal gift tax return was filed by the executors of decedent's estate on his behalf for the taxable year 1964 with the District Director of Internal Revenue, Boston, Mass.

The Commissioner, in his statutory notice of deficiency, determined that gifts of voting trust certificates of Signal made by him in 1962, 1963, and 1964 constituted gifts in contemplation of death and were includable in decedent's gross estate.

Signal was incorporated under the laws of the Commonwealth of Massachusetts on May 13, 1920, and was, at all times material herein, a corporation having its principal place of business in Salem, Mass. Signal originally manufactured automobile parts and accessories, but gradually shifted to the manufacture of floor and rug care appliances, such as vacuum cleaners, floor polishers, and accessories. Its taxable year was a fiscal year ending on the last day of February.

In July 1961, in an attempt to expand, Signal acquired all the issued and outstanding stock of Lewyt Corp., a New York corporation which manufactured and sold vacuum cleaners. The consideration consisted of $3,600 in cash and a note for $24,900. Signal moved Lewyt's operations from Long Island City to its plant in Salem, Mass. At the time of the acquisition, Lewyt had a net operating loss carryover of approximately $800,000. Lewyt remained a wholly owned subsidiary of Signal with its fiscal year ending October 31, at all times material herein.

In July 1963, in another attempt to broaden its product line, Signal acquired 90 percent of the issued and outstanding stock of Techni Electronics, Inc. (Techni), a New Jersey corporation that produced a line of small household appliances such as can openers, blenders, and hair dryers. Its principal place of business, at all times material herein, was in Salem, Mass., and its taxable year was a fiscal year ending March 31 until March 31, 1964, after which date its taxable year was changed to a fiscal year ending the last day of February.

On May 14, 1964, the date of decedent's death, all of the issued and outstanding shares of Signal common stock were subject to the terms of a 10-year voting trust which was executed on January 2, 1960. The 1,950 issued and outstanding shares of the Signal common stock were beneficially owned on the date the voting trust was executed and the date of decedent's death as follows:

| Name | Number of shares | | Percent | |
|---|---|---|---|---|
| | 1/2/60 | 5/14/64 | 1/2/60 | 5/14/64 |
| Louis Zaiger | 997 | 873 | 51.13 | 44.77 |
| Beatrice Zaiger | 211 | 211 | 10.82 | 10.82 |
| Robert I. Lappin | 391 | 423 | 20.05 | 21.69 |
| Marion Lappin | 351 | 383 | 18.00 | 19.64 |
| Trust for the benefit of decedent's grandchildren (Andrew, Peter, and Nancy Lappin | 0 | 60 | 0 | 3.08 |
| Total | 1,950 | 1,950 | 100.00 | 100.00 |

The Signal voting trust designated Louis Zaiger and Robert I. Lappin as trustees and gave them the exclusive right to vote the shares subject to the trust. It required the joint action of both trustees in all instances, but provided that Lappin would continue as sole trustee in the event Louis Zaiger ceased to be a trustee for any reason. The voting trust was in lieu of a 1959 recapitalization plan and was designed to give Lappin a more equal say in the business and to give him 100 percent of the vote in the event that anything should happen to decedent.

Decedent received an annual salary of $51,600 from Signal during its taxable years ended 1960 through 1964. For the same years, Robert Lappin received an annual salary from Signal in excess of $50,000.

The Shetland Co., Inc., was incorporated under the laws of the Commonwealth of Massachusetts on September 26, 1950, and was at all times material herein a corporation having its principal place of business in Salem, Mass. Shetland was organized for the purpose of warehousing and marketing a single-brush electric floor polisher and other products manufactured by Signal. Its taxable year was a fiscal year ending August 31 until August 31, 1961, after which date its taxable year was changed to a fiscal year ending the last day of February. On May 14, 1964, the 100 issued and outstanding shares of the Shetland common stock were subject to a 10-year voting trust, the terms of which and the date of execution coincided with the Signal voting trust. The beneficial ownership of the issued and outstanding Shetland common stock remained unchanged from the date the voting trust was executed until decedent's death as follows:

| Name | Number of shares and percentage of total |
|------|------------------------------------------|
| Louis Zaiger | 26 |
| Beatrice Zaiger | 25 |
| Robert I. Lappin | 25 |
| Marion Lappin | 24 |
| Total | 100 |

During its taxable years 1959 through 1964, Shetland paid an annual salary of $45,000 to both decedent and Robert I. Lappin.

Marshall & Stevens, Inc., was retained by the executors of decedent's estate to value the estate's interest in Signal and

Shetland. Pursuant thereto, an appraisal report, dated January 15, 1965, was prepared. In the preparation of the report, consolidated financial statements of Signal and Shetland were requested of the corporations and were incorporated in the Marshall & Stevens appraisal report. The consolidated earnings figures for Signal and Shetland for 1964 supplied by the corporations and used in the Marshall & Stevens appraisal report are as follows:

SIGNAL MANUFACTURING CO.
THE SHETLAND CO., INC.

COMBINED STATEMENTS OF EARNINGS
1964

|  | Years ended Feb. 28— | | | | |
|  | 1960 | 1961 | 1962 | 1963 | 1964 |
|---|---|---|---|---|---|
| Net sales _____ | $10,898,377 | $9,992,000 | $8,812,826 | $10,662,710 | $13,568,934 |
| Cost of goods sold_____ | 6,193,832 | 6,016,500 | 5,310,484 | 6,671,596 | 9,216,659 |
| Gross profit_____ | 4,704,545 | 3,975,500 | 3,502,342 | 3,991,114 | 4,352,275 |
| Operating expenses_____ | 3,401,006 | 3,344,300 | 2,785,428 | 3,138,208 | 3,791,407 |
| Operating profit_____ | 1,303,539 | 631,200 | 716,914 | 852,906 | 560,868 |
| Other income _____ | 28,101 | 71,200 | 143,793 | 78,409 | 52,216 |
| Other charges _____ | 21,816 | 0 | 1,377 | 0 | 11,072 |
| Profit before taxes _____ | 1,309,824 | 702,400 | 859,330 | 931,315 | 602,012 |
| Provision for taxes_____ | 695,244 | 423,500 | 289,436 | 348,942 | 202,093 |
| Net earnings_____ | 614,580 | 278,900 | 569,894 | 582,373 | 399,919 |
| Shetland net earnings_____ | 194,642 | 40,461 | 241,664 | 49,086 | 15,212 |
| Signal net earnings_____ | 419,938 | 238,439 | 328,230 | 533,287 | 384,707 |

In his audit of Signal for fiscal 1964, the auditor for Signal and Shetland concluded that $86,796 of a $116,716 debt due Signal from Antrim Molding Co. should be written off in that year. The remainder of the debt was written off as worthless 2 years later. Antrim supplied Signal with wooden brush backs for electric floor polishers for a number of years but its operations, in effect, ceased when Signal found a more inexpensive source of supply. The bad debt deduction was allowed as an ordinary business loss for income tax purposes by the Internal Revenue Service.

For the taxable year 1964, Lewyt, a subsidiary of Signal, paid no Federal income tax because of a net operating loss deduction carried over from previous years. If Lewyt had no such deduction, its Federal income taxes for the taxable year ended October 31, 1963, would have been $44,849. After absorbing a portion of its net operating loss carryover for its taxable year ended October 31, 1963, Lewyt had remaining a net operating loss of $500,281 available to carry over to future years.

Julian Gumbiner is executive vice president of Stern Brothers & Co., an investment banking house in Kansas City, Mo. He has been active in the National Association of Securities Dealers, Inc., and served as a member of the board of governors from 1964 to 1966. In addition, he is a director of a number of corporations and has been in the securities business since 1929. He and his firm participated as principals in the purchase of the Rival Manufacturing Co. in September 1963 and the subsequent offering of Rival stock to the public in April 1964.

Nelson J. Darling, Jr., is chairman of the executive committee of the board of Paine, Webber, Jackson & Curtis, Inc., a nationwide investment banking and brokerage company which ranks as one of the largest member firms of the New York Stock Exchange in terms of gross income, capital, and number of employees. He is also a director of several corporations, the stocks of which are listed on the New York Stock Exchange. He has been associated with Paine, Webber since 1950, specializing in the investment banking and corporate finance fields.

The average price, net earnings per share, and price-to-earnings ratio for the indicated corporations on May 14, 1964, were as follows:

| Corporation | Mean price 5/14/64 | 1963 net earnings per share | Price earnings ratio |
|---|---|---|---|
| Electrolux | $34.75 | [1] $2.39 | 14.5 |
| Sunbeam | 51.00 | 3.08 | 16.5 |
| Scott & Fetzer | 37.00 | 2.20 | 16.8 |
| Average price-earnings ratio | | | 15.9 |

[1] As adjusted for a 100-percent stock dividend on 5/9/64.

Although Electrolux, Sunbeam, and Scott & Fetzer manufactured products similar to those produced by Signal, they differed in size, product lines, manufacturing and distribution methods, as well as growth. The Electrolux vacuum cleaner sold for approximately $200 compared to Signal's average sale of $25 to $30. Signal cleaners were sold at retail outlets while Electrolux sold its products directly to consumers in door-to-door campaigns. With annual sales for Electrolux approaching $120 million, its volume exceeded Signal's by tenfold. Scott & Fetzer, better known by its product, the Kirby vacuum cleaner, was

similar to Electrolux in that its products sold for about $250 directly to the consumer rather than through retail outlets. Its $15.5 million sales volume for 1963 was closer to the volume of Signal than either Electrolux or Sunbeam which had annual sales of approximately $195 million in 1963. Sunbeam manufactured vacuum cleaners but was more highly diversified in other appliances than Signal.

In September 1963, Stern Bros. purchased Rival Manufacturing Co. in a private sale for about $6,300,000. In April 1964, 260,000 shares of Rival's common stock were sold to the public. The offering price was $14 per share as determined by independent underwriters, or 9.33 times its earnings for 1963. Stern Bros. retained 150,000 shares of Rival which in effect constituted control. Rival's principal business was the manufacture and nationwide distribution of household appliances. Rival's methods of manufacturing and marketing, its plant area, and its number of employees were similar to Signal's. Rival's sales for 1963 were $14,120,789 as compared to Signal-Shetland's combined sales for fiscal 1964 of $13,568,934. Contrary to Signal-Shetland, Rival had a consistent record of earnings growth:

| Year | Amount |
|------|--------|
| 1960 | $201,132 |
| 1961 | 330,269 |
| 1962 | 461,553 |
| 1963 | 789,210 |

### ULTIMATE FINDINGS OF FACT

(1) Withdrawals by decedent's wife of $29,025 from a joint checking account with decedent were not transfers in contemplation of death.

(2) Gifts of voting trust certificates of Signal made by decedent in 1962, 1963, and 1964 did not constitute gifts in contemplation of death.

(3) The fair market values of voting trust certificates of Signal were $685 per share on January 3, 1964, and $685 per share on May 14, 1964.

(4) The fair market values of voting trust certificates of Shetland were $7,710 per share on May 14, 1964; $7,710 per

share on July 20, 1965; and $7,710 per share on October 11, 1965.

## Issue 1. Cash Transfers in Contemplation of Death

The Commissioner, in his statutory notice of deficiency, included in decedent's gross estate $29,025 in cash withdrawn by decedent's wife from a joint checking account she maintained with decedent. The withdrawals were made within 3 years of date of death and the Commissioner included the withdrawals in the gross estate as transfers in contemplation of death under section 2035 [1] of the Code.

The accountant for the Zaigers testified without objection that Mrs. Zaiger handled all of the personal funds of Mr. Zaiger and herself and that all funds were deposited to their joint bank account which they always had. He testified further without objection that prior to May 1962 the Zaigers jointly owned real property which produced substantial sums of rental income which was deposited to their joint checking account. In addition, the accountant testified without objection that when Mrs. Zaiger withdrew funds from the joint checking account her attitude was that it was her money.

The $29,025 in cash was withdrawn from the joint checking account by Mrs. Zaiger within 3 years of the death of her husband, the decedent. Respondent's determination that the withdrawals were transfers by the decedent in contemplation of death is entitled to the usual presumptive correctness and, in addition, is entitled to the rebuttable statutory presumption that the transfers were made in contemplation of death. Sec. 2035(b); *Estate of Robert W. Hite, Sr.*, 49 T.C. 580, 594 (1968).

The phrase "in contemplation of death" as used in section 2035 is defined in section 20.2035-1(c), Estate Tax Regs., as follows:

---

[1] All statutory references are to the Internal Revenue Code of 1954, applicable to the years before the Court, unless otherwise noted.

[The term] does not have reference to that general expectation of death such as all persons entertain. * * * A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. * * *

The issue under this regulation as to whether a gift has been made in contemplation of death is a factual one which requires an examination of all the evidence with a view to ascertaining whether the decedent's motives were associated with life or with death. *United States v. Wells*, 283 U.S. 102 (1931).

Joint bank accounts are a form of joint tenancy. Yet each joint tenant has the power to withdraw and consume the entire amount of the account. The creation of a joint bank account or the deposit of funds therein does not constitute a taxable gift. Instead, a gift occurs when the joint owner of the account, who does not contribute thereto, withdraws sums from the account. Sec. 20.2511-1(h)(4), Gift Tax Regs.

In ascertaining whether a withdrawal from a joint account falls within section 2035, the problem is complicated by the fact that the donee takes the action necessary to complete the gift while it is the decedent's motive that determines whether a gift is made in contemplation of death. In some cases, the decedent's motive at the time the account was created or deposits to the account were made may be crucial. *Harley A. Wilson*, 56 T.C. 579, 587 (1971), acq. in result only 1972-1 C.B. 2. In other cases, the decedent's intent at the time of withdrawal controls. Moreover, in some instances, the donee's motives may be imputed to the decedent.

We think petitioner has shown that the withdrawals in the instant case were not made in contemplation of death. Decedent and Mrs. Zaiger had a long-standing practice of using a joint bank account as a depository for all of their cash receipts. Substantial funds in the account were contributed by Mrs. Zaiger by reason of her joint ownership with the decedent of income producing real property. At the date of Mr. Zaiger's death, he and his wife held property valued at $107,897.86 as joint tenants. The Federal gift

tax returns filed by the decedent for 1962 and 1963, the years during which Mrs. Zaiger withdrew the funds in question, were executed by Mr. Zaiger and by Mrs. Zaiger as his spouse consenting to be taxed on one-half of the value of gifts to third parties. The withdrawals from the joint checking accounts were not reported on the returns as gifts from Mr. Zaiger to his wife.

We conclude that the decedent knew nothing of the withdrawals made by Mrs. Zaiger from the joint accounts and, therefore, petitioner has overcome the presumptions that they were made in contemplation of death. *Harley A. Wilson, supra.* Cf. *Estate of Robert W. Hite, Sr., supra.* The situation here and in *Wilson* is distinguishable from one wherein a court, on behalf of an incompetent, authorizes transfers of funds to potential heirs of the incompetent in continuation of a gift pattern obviously without the knowledge of the incompetent who died within the succeeding 3-year period. *City Bank Farmers Trust Co. v. McGowan,* 323 U.S. 594 (1945). Here, the decedent did not know of the withdrawals nor were the withdrawals made on his behalf by another. There could not, therefore, be any contemplation of death on the part of the decedent and the $29,025 in withdrawals is not includable in his estate.

Moreover, because of the joint ownership of substantial sums of income deposited to the joint account prior to 1962, some of the funds withdrawn by Mrs. Zaiger were likely her own funds.

### Issue 2. Transfers of Voting Trust Certificates In Contemplation of Death

The Commissioner, in his statutory notice of deficiency, included in decedent's gross estate gifts of voting trust certificates of Signal made by decedent within 3 years of his death based upon the contemplation of death provisions of section 2035 of the Code.

The issue is one of fact and petitioners bear the burden of rebutting the presumption that such gifts were in contemplation of death as provided by section 2035(b) of the Code.

The chronology of events which bear upon the issue may be summarized as follows:

| | |
|---|---|
| 1948-53 | Gifts of Signal stock to Lappins |
| March 1959 | Decedent had a stroke |
| September 1959 | Decedent executed his will |
| Dec. 24, 1959 | Gifts of Signal stock to Lappins |
| Jan. 2, 1960 | Voting trust of Signal adopted |
| Jan. 2, 1960 | Gifts of voting trust certificates of Signal to Lappins |
| June 20, 1961 | Gifts of voting trust certificates of Signal to Lappins |
| September 1961 | Decedent had a heart attack |
| Aug. 30, 1962 | Gifts of voting trust certificates of Signal to Lappins |
| Jan. 3, 1963 | Gifts of voting trust certificates of Signal to Lappins |
| March 1963 | Decedent hospitalized for diabetes |
| July 1963 | Decedent hospitalized for acute pancreatitis |
| Jan. 3, 1964 | Gifts of voting trust certificates of Signal to Lappins |
| February 1964 | Decedent hospitalized for acute colitis |
| April 1964 | Decedent hospitalized for condition which was his final illness |

· The parties do not seriously dispute decedent's motive for the gifts from 1948 through 1953. They were made in recognition of decedent's agreement with his son-in-law, Robert Lappin, that Lappin would gain increasing control of Signal if Lappin did well. When the first gift pattern ended in 1953, decedent still retained 52 percent of the outstanding stock of Signal.

The uncontradicted testimony of Lappin was that in 1958 he requested decedent to give him more control over Signal. The gifts in late December 1959 and the gifts on the date the voting trust was executed were, we conclude, a resumption of the 1948-53 gift pattern in recognition by decedent that the voting trust would resolve any future problems that might arise with respect to the control of Signal. Decedent suffered a stroke in March of 1959 and recovered well enough to first perform his duties at Signal from a wheelchair and then in a normal manner. He executed a will in September. Although the gifts in December were made prior to the execution of the voting trust agreement, the trust must have been in the process of preparation and being the end of the year and being advised from time to time by an accountant, decedent probably decided to split the gifts to the Lappins between 1959 and 1960. The subsequent gifts in 1961 were made before he suffered a heart attack and the gifts in 1963

and 1964 were both made on January 3, both before he was hospitalized for separate illnesses. Decedent's accountant convinced him in 1962 that additional gifts of stock would not diminish his control of Signal.

Respondent relies heavily upon the sequence of events set forth above to argue that the transfers in 1962, 1963, and 1964 were in contemplation of death. We do not see that such events necessarily lead to that conclusion. The testimony of Robert Lappin, decedent's son-in-law, depicts the decedent as a man who suffered many illnesses but was, nevertheless, cheerful and optimistic about the future. Lappin is a member of decedent's family and an executor of the decedent's estate; therefore, his testimony could be challenged because of his interest in the outcome of the issue.

The testimony of decedent's physician, however, in no uncertain terms, supports Lappin's appraisal of the decedent's mental attitude and convinces us that the transfers were not made in contemplation of death. Respondent introduced no evidence to rebut the doctor's testimony nor did respondent in any way discredit the doctor's conclusions as to the decedent's mental attitude.

Accordingly, we hold that decedent's gifts of voting trust certificates in 1962, 1963, and 1964 were not made in contemplation of death and are not properly includable in his gross estate.

### Issue 3. Valuation

The valuation issues relate solely to the fair market values of voting trust certificates in Signal and Shetland and may be recapitulated as follows:

| Taxpayer | Corporation | Valuation date | Event | Number of shares | Values per shares | | |
|---|---|---|---|---|---|---|---|
| | | | | | Tax return | Amended petition | Stat. notice |
| Louis Zaiger ----- | Signal | 1/3/64 | Gift | ¹50 | $1,578 | $685 | $3,500 |
| Estate of Louis Zaiger ----- | Signal | 5/14/64 | Death | ¹873 | 1,577 | 685 | 3,500 |
| Estate of Louis Zaiger ----- | Shetland | 5/14/64 | Death | 26 | 8,738 | 7,710 | 12,600 |
| Beatrice Zaiger ----- | Shetland | 7/20/65 | Gift | 25 | 9,356 | 7,710 | 14,000 |
| Beatrice Zaiger ----- | Shetland | 10/11/65 | Gift | 13 | 9,356 | 7,710 | 14,000 |

¹ The Commissioner, in addition to the voting trust certificates for 873 shares owned by Louis Zaiger at his death, included in the gross estate as transfers in contemplation of death, gifts of certificates for 50 shares made in 1964 and gifts of certificates for 74 shares made in 1961, 1962, and 1963. We have held that the gifts were not made in contemplation of death. The Commissioner has taken the position that if the gifts of certificates for 50 shares are not includable, the fair market value as of the date of the gift (Jan. 3, 1964) should be adjusted as shown above. He made no such determination as to the fair market values of the gifts of certificates made in 1961, 1962, and 1963.

All of the parties relied upon the testimony of expert witnesses to support their valuations. The valuation used on the estate tax return was prepared by Marshall & Stevens, Inc. Their appraisal was stipulated to by the parties. Petitioners introduced the testimony of two expert witnesses at trial, Julian Gumbiner and Nelson J. Darling, Jr. Respondent introduced the testimony of his expert witness, Ellis A. Evans.

The date of death determinations of values of the voting trust certificates per share may be summarized as follows:

| Valuation | Signal | Shetland |
|---|---|---|
| Marshall & Stevens (estate tax return) | $1,577 | $8,738 |
| Amended petition | 685 | 7,710 |
| Gumbiner (for petitioners) | 619 | 3,705 |
| Darling (for petitioners) | 659 | 3,948 |
| Statutory notice | 3,500 | 12,600 |
| Evans (for respondent) | 3,157 | 12,683 |

None of the parties relies upon the valuations submitted by Marshall & Stevens which were used on the estate tax return. That leaves two expert opinions offered on behalf of petitioners (Gumbiner and Darling) and one offered by respondent (Evans).

All three opinions are based upon applying the price-earnings ratios of listed stocks to the earnings of Signal and Shetland. All three rejected application of the ratios to the average of 5 years of earnings as was done in the Marshall & Stevens valuation. Instead, all three applied the ratios to the earnings of Signal and Shetland for 1964 stated in the Marshall & Stevens appraisal report. That statement reflects the following net earnings:

| | |
|---|---|
| Signal | $384,707 |
| Shetland | 15,212 |
| Total | 399,919 |

The experts, Gumbiner and Darling, adjusted the 1964 earnings to reflect a portion of an uncollectible account owed by Antrim which Lewyt wrote off and they also adjusted the earnings to compensate for taxes which would have been payable by Lewyt had it not possessed a net operating loss carryover which absorbed its income tax liability for 1964. The expert, Evans, made no such adjustments to 1964 earnings. A comparison of the net earnings used by the three experts may be summarized as follows:

| | | Gumbiner Darling (for petitioners) | Evans (for respondent) |
|---|---|---|---|
| 1964 earnings of Signal before adjustments _____ | | $384,707 | $384,707 |
| Adjustments for taxes applicable to: | | | |
| Bad debt loss on Antrim_____ | $41,947 | | |
| Lewyt earnings before net operating loss_____ | 95,175 | 137,122 | 0 |
| | | 247,585 | 384,707 |
| Earnings of Shetland_____ | | 15,212 | 15,212 |
| | | 262,797 | 399,919 |

Respondent complains that the adjustments made by the accountant to Signal's earnings figures were improper. The record is less than complete in respect to the steps the accountant took to adjust the earnings of Signal for Lewyt's Antrim bad debt loss and income taxes payable by Lewyt if it did not have the net operating loss. Nevertheless, respondent's expert witness eliminated such adjustments without examining the books and records of Lewyt to ascertain the details of the adjustments. He relied solely upon the description of the adjustments shown in the Marshall & Stevens report. Counsel for respondent did not challenge the propriety or details of the adjustments when the accountant testified. Respondent's expert witness should have given effect to the extraordinary items of the large bad debt loss and the income taxes which Lewyt would have had to pay. The bad debt loss was extraordinary in size and was not reflected on the financial statements. Respondent contends that if an adjustment is made to reflect the income taxes Lewyt did not have to pay by reason of the large net operating loss carryover, then a compensating adjustment should be made for the asset of the net operating loss carryover to years after 1964. It is true that a large net operating loss carryover would be a valuable asset affecting *future* earnings of a corporation but it would not affect current earnings to which a price-earnings ratio is applied. It would be given effect as a final step by an upward valuation. As will become apparent from our ultimate finding, such an adjustment would not increase the value of the voting trust certificates beyond the values pleaded in the amended petitions.

Respondent also contends that earnings should be increased for the salary paid to decedent because respondent "can only wonder

as to the value of the decedent's services during this period." We do not wonder about his services because we believe the testimony of Lappin about his continuing participation in the Signal and Shetland business during his illnesses.

We, therefore, approve the net earnings for 1964 used by petitioners' expert witnesses, Gumbiner and Darling.

The expert witnesses also disagree on the price-earnings ratios they applied to the Signal-Shetland net earnings for 1964. They may be summarized as follows:

Gumbiner (for petitioners)
    Rival Manufacturing Co. _____ 9.33
Darling (for petitioners)
    Experience in public offer-
      ings with other small
      businesses _____ 8.00
Evans (for respondent)
    Electrolux _____ 14.50
    Sunbeam _____ 16.50
    Scott-Fetzer _____ 16.80

Based upon all the evidence in the record, we conclude that the comparables used by the respondent's expert witness are not very comparable because of differences in product mix and size of operations. Respondent admits that such corporations are "premium" compared to Signal and Shetland but they must be sold as a unit (all of the shares); therefore, a premium would be exacted. We think this concept overlooks the proposition that only some of the shares are being valued. The personal experience of Mr. Gumbiner with the Rival Manufacturing Co. stock and the experience of Mr. Darling with public offerings of stock in small corporations convince us that the price-earnings ratios used by Gumbiner and Darling are within an acceptable range. Moreover, respondent's expert based his opinion on a private sale of all the stock of Signal and Shetland, an assumption of questionable validity. Respondent contends that such an assumption is required because the stock in both corporations was subject to a voting trust, citing *Estate of Pearl Gibbons Reynolds*, 55 T.C. 172 (1970). That case is not in point because it involved the effect of a "buy-sell" agreement which was part of the voting trust. In the instant case there was no evidence of a buy-sell agreement. Petitioner's experts applied discounts to their valuations to reflect the minority interest involved and to compensate for the fact that voting control would not be in the

hands of the purchaser. Such considerations were proper and discounts were appropriate. Respondent's reliance upon events subsequent to the valuation dates is unwarranted.

No explanations were offered by the expert witnesses as to why the values on the dates of gifts were different than on the date of death. Because there was no great lapse of time and because there was no evidence to the contrary, we hold that the values did not differ from the value on the date of death.

Based upon the entire record, we hold that petitioners have sustained their burden of proving that respondent's determinations in his statutory notices were not correct and further they have proved that the values alleged in their amended petitions are correct. The fair market values of voting trust certificates of Signal were $685 per share on January 3, 1964, and $685 per share on May 14, 1964. The fair market values of Shetland were $7,710 per share on May 14, 1964; $7,710 on July 20, 1965; and $7,710 on October 11, 1965.

*Decisions will be entered under Rule 155.*