T.C. Memo. 2006-63

UNITED STATES TAX COURT

IAN G. KOBLICK AND TONYA A. KOBLICK, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 13808-04.                    Filed April 3, 2006.

<u>V. Jean Owens</u>, for petitioners.

<u>Timothy Maher</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GOEKE, <u>Judge</u>:  Petitioners Ian G. and Tonya A. Koblick
(individually referred to as Mr. Koblick and Mrs. Koblick,
respectively) challenge respondent's income tax deficiency
determination for 1998 and 1999 which is based upon the
disallowance of charitable deductions that were carried forward
from a 1994 contribution of 45 percent of the outstanding stock

in Sealodge International, Inc. (Sealodge) to Maine Resources
Development Foundation (MRDF), a section 501(c)(3)[1] charity.  The
issue before us is the value of the 45-percent stock ownership
interest in Sealodge.  As explained in more detail herein, we
find that the interest was worth significantly less than reported
by petitioners.

FINDINGS OF FACT

Petitioners are husband and wife who resided in Key Largo,
Florida, as of the date of the filing of the petition.

On December 19, 1994, Mr. Koblick transferred 11,247 shares
of common stock of Sealodge to MRDF.  The 11,247 shares of
Sealodge stock transferred by Mr. Koblick to MRDF represented 45
percent of the outstanding stock of Sealodge.  There were two
other shareholders of Sealodge, Dr. Neil Monney (Dr. Monney), who
owned 45 percent, and Debra Alexander, who owned 10 percent.
They also transferred their shares to MRDF simultaneously with
Mr. Koblick's transfer.

Petitioners received $90,000 from MRDF in exchange for the
45-percent interest in Sealodge transferred to MRDF by Mr.
Koblick.  On their 1994 Form 1040, U.S. Individual Income Tax
Return (Form 1040), petitioners claimed that the fair market
value of the stock in Sealodge donated to MRDF was $810,000, and

---

[1]Unless otherwise indicated, all section references are to
the Internal Revenue Code, as amended, and all Rule references
are to the Tax Court Rules of Practice and Procedure.

that the resulting gift to MRDF was $720,000 ($810,000 gross value of stock less $90,000 received from MRDF).

Petitioners attached to their 1994 income tax return a letter dated January 4, 1995, from the treasurer of MRDF to Mr. Koblick and the two other shareholders of Sealodge. The MRDF letter confirmed the transfer of the MRDF shares and valued those shares based on a report of Edward M. Geiger, a consulting engineer. Mr. Geiger's report and another report prepared by Thomas Ferguson were also attached to the 1994 return.

Petitioners claimed charitable contribution deductions on their Federal income tax returns for their donation of Sealodge stock to MRDF as follows:

| Year | Amount |
| --- | --- |
| 1994 | $55,411 |
| 1995 | 71,138 |
| 1996 | 65,889 |
| 1997 | 103,568 |
| 1998 | 357,601 |
| 1999 | 66,221 |

Petitioners timely filed their Forms 1040 for the calendar years 1998 and 1999 with the Internal Revenue Service in Atlanta, Georgia, on August 13, 1999, and August 19, 2000, respectively.

Respondent determined in the notice of deficiency for 1998 and 1999 that petitioners owed deficiencies of $84,956 and

$18,204, respectively. The adjustments to income for both years resulted from the reduction of the claimed deduction for the 1994 contribution of Sealodge stock from $720,000 to $360,000.

## Sealodge

Sealodge was incorporated in Florida in July 1987. Sealodge's stock was never publicly traded or listed on a public exchange. Debra Alexander received her 10-percent interest in Sealodge from William Alexander in December 1990. This was the sole transfer of Sealodge's stock prior to the transfers of Sealodge stock to MRDF on December 19, 1994.

The bylaws of Sealodge restricted the transfer of the corporation's stock as follows:

> a. Sealodge's stock was nontransferable through sale or otherwise without the prior approval of the corporation;

> b. Sealodge reserved the right to deny a transfer of the corporation's stock; and

> c. Sealodge reserved the right to purchase or refuse to purchase the stock of any shareholder who desired to transfer his or her stock.

At all relevant times, Mr. Koblick and Dr. Monney were the sole directors and officers of Sealodge. Mr. Koblick was the president and treasurer of Sealodge; Dr. Monney was the secretary.

During the period January 1, 1990, through December 31, 1994, Sealodge did not have any cashflow available to increase equity, and Sealodge never paid a dividend.  As of December 19, 1994, Sealodge did not have any liabilities.

On or about August 7, 1987, Sealodge registered a trademark with the U.S. Patent and Trademark Office for the name "Jules Undersea Lodge".  This trademark expired on September 26, 1994, and was not renewed.

As of December 19, 1994, Sealodge's assets consisted of: (1) A submersible barge known as "Jules Undersea Lodge"; (2) a command center; (3) two diving bells; and (4) other miscellaneous equipment whose value was not of significance.  A plan of liquidation was in place on the valuation date so Sealodge's assets could be distributed to MRDF.  Sealodge was liquidated as of December 31, 1994.

Jules Undersea Lodge

Jules Undersea Lodge was built in 1972 by Perry Submarine Builders (Perry).  It was originally named "La Chalupa" and was constructed with private funds advanced by John Perry, the owner of Perry.  Operational funds for La Chalupa were provided by the Government of Puerto Rico under the Puerto Rico International Undersea Laboratory program (PRINUL).  The vessel was designed to house researchers for a week or more at a time at depths of up to and not exceeding approximately 160 feet.  During the early

1970s, the vessel was submerged off the coast of Puerto Rico. Mr. Koblick was involved as director of the PRINUL program during the early-to-mid portion of the 1970s. Eventually, by the mid-1970s, funding for the PRINUL program ceased, and John Perry reclaimed the vessel. La Chalupa ended up in dry dock storage in south Florida. During 1982, an individual, Russ Hobson, undertook extensive renovations of the vessel at a cost of approximately $300,000. Mr. Hobson intended to use the vessel for a salvage operation in South America. Mr. Hobson later became financially imperiled and abandoned the project. In 1984, Mr. Koblick and Dr. Monney acquired the vessel from the Derecktor Gunnell shipyard by paying $20,000 towards an outstanding yard bill. The vessel was then transferred to a corporate entity, Jules Habitat, Inc. Mr. Koblick and Dr. Monney were the shareholders of Jules Habitat, Inc. Mr. Koblick and Dr. Monney together invested an additional $80,000 in 1986 into the project.

By the end of 1986, a total of $400,000 had been invested into the renovation project (comprising $300,000 invested by Mr. Hobson, $20,000 to acquire the vessel from Derecktor Gunnell, and $80,000 to convert the vessel into a habitat and acquire operational systems). The collective renovations undertaken by Mr. Hobson, Mr. Koblick, and Dr. Monney converted the vessel into an undersea habitat or "lodge" with two suites and a common room.

There were a total of five beds in the habitat.  The vessel was rechristened "Jules Undersea Lodge" (JUL).

By the end of 1986, JUL was submerged in a lagoon located in Key Largo, Florida.  JUL had its first overnight guest by 1986. By 1989, the vessel and its related equipment were transferred to Sealodge.

The cost to build a vessel in accordance with the standards of the American Board of Shipping (ABS) and to have the vessel certified by the ABS would be from 25 to 50 percent more than the cost to build the same vessel without ABS certification. JUL has never been certified by ABS.

JUL has been subject to a regular maintenance program, but there have been no major renovations to it since 1986.

During the years prior to and following the contribution in dispute, approximately 90 percent of JUL's usage was as an undersea hotel.  The remaining use has been as a research facility.  The operation of JUL as an undersea hotel had net operating losses for the 4 years prior to the charitable contribution ranging from $5,434 to $21,067.

OPINION

In this valuation dispute, the parties adopt very similar methodologies but use widely different estimates of the elements of the methodologies they apply.  Petitioners' position presents an internal inconsistency between the estimate of replacement

cost used by petitioners' principal witness at trial and the determination of replacement cost used to estimate the donation by MRDF which was attached to petitioners' return for 1994 with a letter from MRDF to the donees. Our discussion will start with the role of replacement cost in the parties' methodologies.

Petitioners' expert at trial was Thomas Ferguson, a self-described marine surveyor. He valued JUL by starting with an estimate of replacement cost of $4.25 million. He then determined that JUL had a useful life of 18 years from its "reoutfitted [sic] date in 1982 and salvage value of $620,000", thus resulting in depreciation of $2,450,000 from the replacement cost of $4,250,000 and a fair market value of $1.8 million as of December 19, 1994. Mr. Ferguson's original report was attached to petitioners' 1994 income tax return and reached the same conclusions as the report submitted at trial.

As stated previously, a letter to the donees of Sealodge from MRDF, dated January 4, 1995, was also attached to the 1994 return. Referenced in this letter and also attached to the 1994 return was a report prepared by Edward Geiger, a consulting engineer. Mr. Geiger's report determined the value of JUL and related equipment as $1.97 million based upon "the estimate cost to replace this vessel."[2]

---

[2]Inexplicably, petitioners argue on brief that this information should be ignored because Mr. Geiger's report was not
(continued...)

There is an obvious conflict between the use of $4.25 million as a replacement cost by Mr. Ferguson and Mr. Geiger's estimate of replacement cost. However, Mr. Ferguson testified at trial he was not made aware of Mr. Geiger's estimate when he prepared his original report. There is an additional problem with the $4.25 million figure. It was based on a letter from Perry Oceanographic Foundation, a firm related to Perry, to Mr. Ferguson dated December 7, 1994. Perry's estimate was for an ABS-certified vessel, which JUL was not. Mr. Geiger had worked for Perry and was familiar with JUL's original construction. He knew JUL was not ABS certified, and his estimate of $1.97 million is more accurate than the $4.25 million figure.

Respondent's valuation expert, Mr. Geary, also determined replacement cost and depreciated that cost to arrive at a value for JUL. His replacement cost estimate was $1.1 million, which he reduced by 27 percent for inflation and further reduced for depreciation to arrive at a value of $464,102. He also used an alternative method based upon JUL's estimated value in 1977 and recommended a value of $367,758.

While expert opinions may assist in evaluating a claim, we are not bound by those opinions and may reach a decision based on

[2](...continued)
admitted at trial. Petitioners are in error. The report was stipulated as part of a joint exhibit (Ex. 3J), the 1994 income tax return, and ironically was admitted at petitioners' urging over respondent's objections.

our own analysis of all the evidence in the record.  Helvering v. Natl. Grocery Co., 304 U.S. 282, 295 (1938); Estate of Newhouse v. Commissioner, 94 T.C. 193, 217 (1990).  Where experts offer conflicting estimates of fair market value, we must weigh each estimate by analyzing the factors they used to arrive at their conclusions.  Casey v. Commissioner, 38 T.C. 357, 381 (1962).  This Court may accept or reject the opinion of an expert in its entirety, or we may be selective in the use of any portion.  Estate of Davis v. Commissioner, 110 T.C. 530, 538 (1998); Parker v. Commissioner, 86 T.C. 547, 562 (1986); Buffalo Tool & Die Manufacturing Co. v. Commissioner, 74 T.C. 441, 452 (1980).

We are not persuaded that Mr. Geary's alternative method is superior to the replacement method, and we do not find the replacement values used by either Mr. Ferguson or Mr. Geary to be the best estimate in the record.  Rather, we find Mr. Geiger's replacement cost to be the best starting point.  His involvement with the construction of JUL and his background make his estimate the best choice to start the analysis.  We then depreciate his value as Mr. Ferguson testified he would do, had he been aware of Mr. Geiger's report and selected his replacement cost value.  This computation yields a fair market value for JUL of $1,060,000.

This does not end our analysis because JUL was owned by Sealodge, and we must determine the value of petitioners' 45-percent interest.

Minority and Lack of Marketability Discounts

Minority discounts and discounts for lack of marketability are often discussed together, but they are distinguishable. Estate of Murphy v. Commissioner, T.C. Memo. 1990-472. Shares of corporate stock which represent a minority interest may be worth less than a proportionate share of the value of the assets of the corporation. Id. (citing Harwood v. Commissioner, 82 T.C. 239, 267-268 (1984), affd. without published opinion 786 F.2d 1174 (9th Cir. 1986)); Estate of Andrews v. Commissioner, 79 T.C. 938, 957 (1982); Estate of Zaiger v. Commissioner, 64 T.C. 927, 945-946 (1975). In Estate of Andrews v. Commissioner, supra at 953, we noted the distinction between a minority discount and lack of marketability discount:

> The minority shareholder discount is designed to reflect the decreased value of shares that do not convey control of a closely held corporation. The lack of marketability discount, on the other hand, is designed to reflect the fact that there is no ready market for shares in a closely held corporation. Although there may be some overlap between these two discounts in that lack of control may reduce marketability, it should be borne in mind that even controlling shares in a nonpublic corporation suffer from lack of marketability because of the absence of a ready private placement market and the fact that flotation costs would have to be incurred if the corporation were to publicly offer its stock. * * *

We shall first address the minority discount.  A minority discount is appropriate if the block of stock does not enjoy the variety of rights associated with control.  Estate of Andrews v. Commissioner, supra at 953; Estate of Murphy v. Commissioner, supra (citing Estate of Chenoweth v. Commissioner, 88 T.C. 1577, 1582 (1987)).  Control means that, because of the interest owned, the shareholder can unilaterally direct corporate action, select management, decide the amount of distribution, rearrange the corporation's capital structure, and decide whether to liquidate, merge, or sell assets.  Estate of Newhouse v. Commissioner, 94 T.C. 193, 251 (1990).  Respondent's experts testified about the difficulties a 45-percent shareholder would face in changing Sealodge's corporate policies in view of its bylaws.  However, respondent's experts also pointed out the fact that petitioners' interest in Sealodge had "swing vote" attributes and could be joined with any of the two remaining blocks of stock to exercise control in the corporation.  We shall take these factors into consideration.

Petitioners argue that since MRDF ultimately received control of the stock in Sealodge, no discount is warranted. Section 25.2511-1(a), Gift Tax Regs., explains that the gift tax is an excise tax on the transfer and is not a tax on the subject of the gift.  Sec. 25.2511-2(a), Gift Tax Regs.  Section 25.2511-2(a), Gift Tax Regs., provides:

The gift tax is not imposed upon the receipt of the
property by the donee, nor is it necessarily determined
by the measure of enrichment resulting to the donee
from the transfer, nor is it conditioned upon ability
to identify the donee at the time of the transfer.* * *

Therefore, in valuing the stock petitioners transferred, we do not focus on what Sealodge actually received.

However, there is authority for us to take into consideration that petitioners transferred their 45-percent interest in Sealodge as part of a prearranged plan to transfer a 100-percent controlling interest in the company. In N. Trust Co. v. Commissioner, 87 T.C. 349 (1986), four shareholders agreed to transfer each of their 25-percent noncontrolling interests in their closely held corporation to certain long-term trusts. The taxpayers contended that the minority discount should be 90 percent. However, the Court allowed only a 25-percent discount. The Court determined that the taxpayers, by following a prearranged agreement to transfer the shares simultaneously, "marched in lockstep" and that "So marching, their position was no different than that of a single majority shareholder." Id. at 388.

Here, we have a similar situation where petitioners and the two other shareholders of Sealodge had a prearranged plan to transfer their minority shares simultaneously. Therefore, we find that N. Trust Co. is instructive. Given this determination, we believe respondent's proposed figure of 22 percent is too

high.  In <u>N. Trust Co.</u>, we allowed a 25-percent minority discount for a 25-percent voting interest in a corporation.  In this case, we hold that a 10-percent discount is applicable, but a holding of a 6-percent discount is sufficient to sustain the adjustment in the notice of deficiency. Therefore, we sustain respondent's adjustment without reaching the other arguments for discount raised by respondent.

<u>Conclusion</u>

After applying a minority-position discount of 10 percent, we would find that the 45-percent interest in Sealodge transferred by Mr. Koblick had a value of $429,300 at the time of his gift of stock to MRDF.  Therefore, the deduction value would be $429,300 less $90,000 or $339,300.  Because the notice of deficiency determines a higher value, we sustain that determination and find that

<u>Decision will be entered</u>

<u>for respondent</u>.