HARLEY A. WILSON, TRANSFEREE, ESTATE OF STELLA M. WILSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

BEULAH L. ZURCHER, TRANSFEREE, ESTATE OF STELLA M. WILSON, PETITIONER *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Dockets Nos. 3408–69, 3409–69.   Filed June 21, 1971.

*Myron E. Anderson*, for the petitioners.
*Joseph M. Wetzel*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined that each petitioner is liable as transferee for a deficiency of $9,949.74 in the Federal estate tax of the Estate of Stella M. Wilson. The questions presented for decision are:

(1) Whether on the date of Stella M. Wilson's death she was the owner of a contract right entitling her to collect $234.25 in accrued interest from her grandson;

(2) Whether Stella M. Wilson made completed gifts to her two adult children of certificates of deposit and of funds deposited in certain savings accounts, all of which were maintained in the joint names of her and one of the children, with the result that such certificates and funds are not includable in her gross estate under section 2040;[1] and

(3) Whether Stella M. Wilson's gift of the funds in a savings account was made in contemplation of death within the meaning of section 2035.

### FINDINGS OF FACT

Petitioner Harley A. Wilson (hereinafter referred to as Harley) resided in Nyssa, Oreg., at the time he filed his petition herein. Petitioner Beulah L. Zurcher (hereinafter referred to as Beulah) resided in Parma, Idaho, at the time her petition in this proceeding was filed.

---

[1] All section references are to the Internal Revenue Code of 1954, as amended, unless otherwise noted.

Stella M. Wilson (hereinafter referred to as decedent or Stella) died intestate on February 12, 1965, at Harley's home in Nyssa, Oreg. She resided in Parma at the time of her death, and her estate was probated in the Probate Court of Canyon County, Idaho, with Lester W. Zurcher, Beulah's husband, serving as administrator. On January 25, 1966, an estate tax return was timely filed with the district director of internal revenue for the district of Idaho.

All of the decedent's property was distributed in equal shares to the petitioners herein. The total value of the property so distributed was $58,773.60 in money and $55,870 in real estate.

### Issue 1. Accrued Interest on Contract

On January 3, 1962, the decedent and her husband, Charles L. Wilson (hereinafter referred to as Charles), executed a contract to sell real property to Darrell L. Wilson (hereinafter Darrell), their grandson. The contract provided for the payment of the purchase price in the following manner:

Cash the sum of twenty thousand ($20,000) dollars receipt wich [sic] is hereby acknowledged by the parties of the first part. The balance of the purchase price to be the sum of twenty thousand ($20,000) dollars. Payments to be made annually on January 10th to the sum of six thousand ($6,000) dollars, plus five (5) percent interest on unpaid balance. Failure to make payments of same on January 10th of each year the party of the second part forfiets [sic] all his rights to the property herein described and will revert back to the parties of the first part without any recourse in law.

Charles died on August 17, 1964, and this contract thereupon became the property of Stella. Between January 3, 1962, and February 12, 1965, Darrell made payments under this contract, and on the latter date there remained a principal balance of $9,370. No interest payments were ever made by Darrell in connection with the contract. When Darrell attempted to pay the decedent the interest due under the contract, she refused to accept it, telling Darrell that she did not care to have interest paid. On Stella's death, the contract became the property of Harley, and he collected no interest thereon.

In the notices of deficiency, respondent determined that the decedent's estate had a right to collect accrued interest of $234.25 from Darrell for the period between Charles' death and the decedent's death.

### Issue 2. Bank Deposits and Time Certificates

On July 19, 1963, the decedent and her daughter Beulah went to Caldwell, Idaho, where they visited three banks. At The Idaho First National Bank, the decedent opened savings account No. 10860 in the names of "Stella M. Wilson or Bulah [sic] L. Zurcher" and deposited $5,000 of her own funds therein. At the First Federal Savings and Loan

Association of Boise, decedent opened savings account No. 6941 in the names of "Wilson, Stella M. or Beulah L. Zurcher" and deposited $9,000 which was transferred from an account previously carried in the names of Charles and Stella. At the Bank of Idaho, decedent changed the title of savings account No. 14928 from her own name to "Stella M. Wilson or Beulah L. Zurcher" and added $5,937.84 to an already existing balance of $4,062.16, making a total balance of $10,000. After they returned to their car, decedent handed Beulah the passbooks and told her that she could use the money and enjoy it. Beulah kept the passbooks in a deposit box in her home.

On January 7, 1964, the decedent and Beulah again went to Caldwell where the decedent deposited an additional $800 of her own funds in account No. 14928. The passbook remained in Beulah's possession.

Beulah never deposited any funds in the three accounts; nor did she report as income any of the interest earned on these deposits.

On February 2, 1965, Beulah withdrew all of the funds in account No. 10860, that sum being $5,221.81. On February 12, 1965, the day her mother died, Beulah closed out the two remaining accounts—No. 14928 and No. 6941—and deposited these funds in accounts bearing the title of "Beulah L. Zurcher or Lester Zurcher." When they were closed, account No. 6941 contained $9,609.50 and account No. 14928 contained $11,344.51.

On January 8, 1964, the decedent opened, at the Bank of Idaho, savings account No. 17535 in the names of "Stella M. Wilson or Harley A. Wilson" and deposited $10,400 of her own funds therein. At The Idaho First National Bank, she opened savings account No. 11052 in the names of "Stella M. Wilson, or Harley A. Wilson" and deposited $9,114.04 of her own funds therein. When Harley visited his mother later that day, he signed the appropriate signature cards for the aforementioned accounts; and decedent then gave him the two passbooks. She told him he could use the money; that she had given Beulah some money also; and that he ought to buy a new car.

Harley never deposited any funds in the accounts; and in his tax returns he reported no interest income from this source.

On February 12, 1965, the date decedent died, Harley withdrew the money then on deposit in the two accounts and placed them in accounts bearing the name of "Harley A. or Betty Jo Wilson." At that time acount No. 17535 contained $10,767.18 and account No. 11052 contained $9,435.81.

On January 7, 1965, the decedent purchased in the names of "Stella M. Wilson or Harley A. Wilson," two $10,000 time certificates of deposit numbered 10747 and 10748. The certificates contained the following provision: "Payable to said owner, or, if more than one, to either

or any of said owners or the survivor or survivors * * *." She gave these certificates to Harley and told him he could use these funds.

On January 13, 1966, the certificates were redeemed and included in Stella's gross estate under Schedule C of her estate tax return.

The decedent never filed gift tax returns reporting the transfers of any of the savings accounts or the funds for which the certificates of deposit were issued. On July 14, 1970, Harley and Beulah filed gift tax returns for 1963, 1964, and 1965 and paid a gift tax of $2,492.71.

In the notices of deficiency, respondent determined that the joint account Nos. 17535, 11052, and 14928 were held in joint tenancy by decedent at the date of her death and that decedent had furnished all the funds in these accounts; thus, the total amount contained in these three accounts was includable in decedent's taxable estate under section 2040.[2]

## Issue 3. Contemplation of Death

From 1946, when Stella and her husband, Charles, moved to Parma, Idaho, until her death, decedent performed all of the daily chores of a farmer's wife including milking their cow, maintaining the yard, cooking, washing, ironing, and caring for her husband while he was ill.

Sometime prior to 1963, Stella's husband suffered a stroke which left him ambulatory but with a severe hostility toward Stella. In July 1963, the hostility caused her to move to the nearby community of Homedale for several months. In September 1963, she took a 4-month trip to California, Arizona, and Oklahoma in order to visit relatives. While she was away, her husband suffered another stroke and, upon her return to Parma in December of that year, she resumed caring for him.

In August 1964, shortly after her husband's death, decedent complained of shortness of breath, inability to lie flat on her stomach, general weakness, and swelling of her abdomen and legs. Dr. John Paul Finck, who had treated decedent for a number of years, concluded that she was in heart failure at that time, and an electrocardiogram disclosed a pocket of healed scar tissue on the wall of her heart. Dr. Finck was of the opinion that, apparently unbeknownst to decedent, she had suffered a heart attack sometime in 1963.

From August 1964 through February 8, 1965, decedent saw Dr. Finck approximately 8 times. During that period, she responded fairly well to several cardiac medicines. On February 8, 1965, decedent complained of a loss of appetite and vomiting. Dr. Finck thought she was

---

[2] Account No. 6941, as well as the two time certificates of deposit, were included in decedent's estate under Schedule C of her estate tax return; petitioners, however, now contend that these inclusions were erroneous.

having a recurrence of gallbladder complications, a problem for which she had received treatment on a number of occasions between 1947 and 1960. He ordered her to stop taking all cardiac medicine for a few days. Decedent died 4 days later due to acute congestive heart failure. She was 65 years old at the time.

In the notices of deficiency, respondent determined that the withdrawal of the funds in account No. 10860 by Beulah on February 2, 1965, constituted a transfer in contemplation of death and was includable in decedent's estate under section 2035.

#### ULTIMATE FINDINGS OF FACT

1. At the time of decedent's death, Darrell L. Wilson did not owe decedent interest under the contract to sell real property, executed on January 3, 1962.

2. Decedent did not make completed gifts to Beulah L. Zurcher of the funds in savings account Nos. 6941 and 14928. Nor did she make completed gifts to Harley A. Wilson of the funds in savings account Nos. 17535 and 11052 or of the time certificates of deposit numbered 10747 and 10748.

3. Decedent did not transfer the proceeds of savings account No. 10860 to Beulah L. Zurcher in contemplation of death.

#### OPINION

### *Issue 1. Accrued Interest on Contract*

The first issue for decision is whether the decedent, at the time of her death, had a right to collect $234.25 as accrued interest under a written contract executed January 3, 1962, for the sale of real property to Darrell, her grandson. If so, the value of such right is includable in decedent's estate under section 2033, quoted in footnote 4 *infra.*

After Charles' death in August 1964, Darrell offered to pay interest on the balance due under the contract, but decedent refused to accept the payment, stating that she did not want any interest on the debt. Darrell acquiesced in decedent's agreement to relieve him of interest on the contract, and he paid no interest thereafter. In view of these facts, respondent erred in including this item in decedent's taxable estate. Darrell did not owe the interest at her death.

The parties have briefed extensively the applicability of the parol evidence rule. However, since respondent did not object to the oral testimony on this point when it was presented, we do not think the rule is any barrier to our consideration of all the testimony. Moreover, whether that testimony is viewed as evidence of an oral amendment of a written contract or a clarification of the terms of the agreement, we

do not think we are precluded from its consideration. See *Smith* v. *Commissioner*, 324 F. 2d 725 (C.A. 9, 1963), affirming a Memorandum Opinion of this Court, and cases cited.

*Issue 2. Bank Accounts (Nos. 6941, 14928, 11052, and 17535) and Time Certificates of Deposit*

The next issue is whether decedent made completed gifts to her two adult children of the funds deposited in four of the five savings accounts and the funds represented by the two time certificates of deposit. Respondent has conceded that the withdrawal by Beulah from savings account No. 10860 on February 2, 1965, completed a gift of the funds in that account. We do not think petitioners have shown a completed gift of any of the other accounts or the time certificates of deposit.

The testimony is that, in July 1963, decedent had her daughter Beulah's name added to the signature cards and passbooks for account Nos. 6941 and 14928, then containing about $19,000, and handed her the passbooks, stating that Beulah could use the money in the accounts. Similarly, in January 1964, she added her son Harley's name to account Nos. 11052 and 17535, containing about $19,500, and 1 year later purchased two time certificates of deposit in her and Harley's names, evidencing deposits of $20,000. According to the testimony, she told him that he could use these funds. Both of her children were responsible adults in their early forties. Yet there is no explanation why, if decedent intended absolutely and irrevocably to divest herself of title, dominion, and control of the accounts and deposit certificates, she kept her name on them. *Estate of Oliver B. Avery*, 40 T.C. 392, 403 (1963). Harley testified that decedent never told him why she kept her name on the accounts, and Beulah gave no explanation. Since her name remained on the accounts and certificates, she retained the power to withdraw the funds and to use them for her own purposes. *Estate of Michael A. Doyle*, 32 T.C. 1209, 1214 (1959). We think she knew this to be true, because the $9,000 deposited in account No. 6941 was withdrawn by her on the same day from a joint bank account previously maintained in her name and that of her husband.

Beulah's name was added to the two accounts (Nos. 6941 and 14928) on July 19, 1963. The testimony shows that on or about that date— some time during July 1963—the decedent separated from her husband because of the severe hostilities he had developed toward her following a series of strokes. These accounts represented a substantial portion of the cash resources available to her, and it seems unlikely that she would have divested herself of a large part of her cash on the occasion of her assuming responsibility for her own support. Nor had her situation changed materially when she added Harley's name

to the other accounts and the deposit certificates. Although she had returned to live with her husband and had resumed taking care of him in December 1963, she no doubt knew that his death was imminent and that she would soon be dependent upon her own resources. We think she retained her name on the savings accounts and certificates of deposit so that she would have the funds available for her use in the event she needed them.

As further evidence that decedent did not intend the addition of her children's names to these accounts to constitute immediate gifts, we note that she did not file gift tax returns reporting the transactions; such returns were not filed until after she died. Nor did either Beulah or Harley make any additional deposits in the accounts or report in their income tax returns as taxable income the interest as it accumulated on the accounts. While they retained possession of the passbooks, they made no withdrawals from the accounts and exercised no other rights of ownership over them.

As we view the evidence, the most that decedent did in connection with these accounts and certificates was to transfer to Beulah and Harley a present right and power to withdraw all or part of the funds, authorizing them to use the funds for their own purposes without accounting to her. At the same time she retained a similar right. Gifts of the funds to Beulah and Harley would not be completed unless and until they exercised the right conferred upon them to withdraw the funds. *Estate of Robert W. Hite, Sr.*, 49 T.C. 580, 594 (1968). Until that was done, decedent retained the right and power to withdraw the funds and use them, or redeposit them in an account which was exclusively hers. See cases cited in 48 A.L.R. 189, 199–201 (1927); 66 A.L.R. 881, 888 (1930); 103 A.L.R. 1130–1131 (1936).

In view of these facts, these accounts and time certificates of deposit fall squarely within section 2040,[3] which includes in a decedent's estate "all property to the extent of the interest therein * * * deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor." The only exception—"such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full considera-

---

[3] Sec. 2040 is, in pertinent part, as follows:

SEC. 2040. JOINT INTERESTS.

The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth: * * *

tion in money or money's worth"—does not aid petitioners. *Estate of Michael A. Doyle, supra; Estate of Oliver B. Avery, supra; Estate of John H. Boogher*, 22 T.C. 1167, 1171 (1954). By adding the names of Beulah or Harley to these accounts, decedent gave one of them power to withdraw funds from each of the accounts, but until that was done decedent retained such an interest in the accounts and certificates of deposit as to require their inclusion in her estate.[4]

We find nothing in Idaho law which so limits "the extent of the interest" of decedent in the accounts as to permit a contrary conclusion. Under Idaho Code Ann. sec. 26–1014 (1968), relating to the creation of joint bank accounts with the right of survivorship, a bank is discharged of its obligation with respect to such an account if it pays either one of the persons in whose name the account is carried. The rule is now settled that this section is "intended primarily for the protection of the banks. It is not intended to determine the rights of the depositors and the rights of those claiming under them." *In Re Chase's Estate*, 82 Idaho 1, 348 P. 2d 473, 478 (1960).

Idaho Code Ann. sec. 55–104 (1957) provides, in part:

Every interest created in favor of several persons in their own right is an interest in common, * * * unless declared in its creation to be a joint interest * * *

Under this section, the intention of the parties, ascertained in the light of all the circumstances, is controlling in determining their respective rights. Thus in *Gray* v. *Gray*, 78 Idaho 439, 304 P. 2d 650 (1956), a father created a joint bank account with right of survivorship in his minor daughter, and her mother claimed the funds as community property; the court found that the account was the father's separate property and that the gift of the account to the daughter becomes a completed one on his death. In *Shurrum* v. *Watts*, 80 Idaho 44, 324 P. 2d 380 (1958), the court held that a mother had no interest in property purchased with funds deposited by her son in an account maintained in their joint names on the ground that the son did not intend, by adding his mother's name to the account, to give her an immediate ownership interest in such funds. Consistently, *In Re Chase's Estate, supra*, presented the question whether the funds in joint accounts passed to a beneficiary under a decedent's will or to the joint owner designated in the bank signature cards; the court held that the evidence did not show that the decedent intended to make gifts of the deposits in the joint account, and that the account passed by decedent's will.

---

[4] The accounts are also includable in decedent's taxable estate under sec. 2033, which is as follows:

SEC. 2033. PROPERTY IN WHICH THE DECEDENT HAD AN INTEREST.

The value of the gross estate shall include the value of all property to the extent of the interest therein of the decedent at the time of his death.

Applying the principles of these cases, for the reasons we have stated we do not think decedent intended to make an inter vivos gift of the accounts or the certificates of deposit. Nor is there any evidence whatever that decedent intended to create tenancies in common in the accounts by making completed gifts of only fractional interests therein. The accounts are includable in decedent's estate.

### Issue 3. Contemplation of Death—Account No. 10860

Respondent concedes that a gift to Beulah of the proceeds of account No. 10860 was completed when she withdrew them on February 2, 1965. He contends, however, that the funds so withdrawn are includable in decedent's estate as a transfer in contemplation of death within the meaning of section 2035.[5] We do not agree.

Section 20.2035–1(c), Estate Tax Regs., states that the phrase "in contemplation of death"—

does not have reference to that general expectation of death such as all persons entertain. * * * A transfer "in contemplation of death" is a disposition of property prompted by the thought of death (although it need not be solely so prompted). A transfer is prompted by the thought of death if (1) made with the purpose of avoiding death taxes, (2) made as a substitute for a testamentary disposition of the property, or (3) made for any other motive associated with death. * * *

The guidelines prescribed by this regulation pose a question of fact which requires an examination of all the evidence with a view to ascertaining the decedent's motive, *United States* v. *Wells*, 283 U.S. 102 (1931)—whether her motives were associated with life or with death.

Respondent emphasizes decedent's deteriorating physical condition as of February 2, 1965, when Beulah withdrew funds from the account, and argues that decedent was then apprehensive of death. Although the gift was not completed until February 2, 1965, we think decedent's motives and intent must be viewed as of July 19, 1963, when she added Beulah's name to this account. At that time she authorized Beulah to withdraw the funds for her own use, albeit decedent retained a similar right. There is no evidence whatever to support an inference that decedent suggested, or was even aware of the February 2, 1964, withdrawal. While she had made it possible for Beulah to withdraw the funds, she had done that more than 18 months previously.

Viewing the creation of this joint bank account as of July 19, 1963, we do not think it involved a transfer in contemplation of death. Prior

---

[5] SEC. 2035. TRANSACTIONS IN CONTEMPLATION OF DEATH.

(a) GENERAL RULE.—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

to that date decedent had lived on a farm with her husband, taking care of him and performing numerous chores. After leaving him, she moved to the nearby community of Honiedale, where she lived alone, and later took an extended trip, visiting relatives in Arizona, California, and Oklahoma. She made no efforts to equalize between the two children the joint accounts created at this time, but set up joint accounts with only Beulah. At that time she orally authorized Beulah to use the funds deposited in the accounts. Significantly, also, she retained a similar right to herself. In December 1963, she returned to her husband and continued to care for him until shortly before he died in August 1964. Not until after her husband's death did she learn that she was seriously ill. We do not think she was contemplating death in July 1963.

*Decisions will be entered under Rule 50.*