Florence A. HANEKE

v.

**UNITED STATES of America.**

**Civ. A. No. M–74–161.**

United States District Court,
D. Maryland.

Sept. 22, 1975.

Daniel H. Honemann and Clapp, Somerville, Black & Honemann, Baltimore, Md., for plaintiff.

Edward J. Snyder, Atty., Dept. of Justice, Washington, D. C., for defendant.

## MEMORANDUM OPINION

JAMES R. MILLER, Jr., District Judge.

This action was brought by the plaintiff, Florence A. Haneke, as the surviving spouse of August B. Haneke under 28 U.S.C. § 1346(a)(1) [1] to recover certain federal estate taxes with respect to the estate of her husband who died March 23, 1971, domiciled in Maryland. The parties have submitted the matter for the court's determination upon the record without a trial. The record contains the pleadings, the plaintiff's answers to defendant's interrogatories, and the deposition of the plaintiff whose credibility has not been placed in issue by the defendant.

### I

#### Facts

August B. Haneke was born in Baltimore, Maryland, on August 13, 1894. He made his career as an officer of the Chesapeake and Potomac Telephone Company, retiring as a Vice President of that company in 1948. He continued working, however, for a few years thereafter, primarily with the Baltimore Transit Company. In 1963, Mr. Haneke suffered a heart attack for which he was hospitalized at Mercy Hospital in Baltimore City. He was hospitalized again in 1969, and for a third time in April of 1970, and shortly thereafter was admitted to Armacost Nursing Home in Baltimore County, suffering from Parkinson's Disease, where he died of pneumonia on March 23, 1971.

The plaintiff, Florence A. Haneke, and Mr. Haneke were married in May of 1937. Mr. Haneke was a dedicated and successful business man, and over the years following their marriage his earnings in excess of their requirements were invested in securities, bank accounts and other assets, but always in the joint names of the two of them. This was done as a matter of convenience and as a reflection of their attitude that all of their property and assets, in effect, belonged to both of them. Most of their assets remained in this form until Mr. Haneke's death, and Schedule E "Jointly Owned Property" of the Federal Estate Tax Return filed for Mr. Haneke's estate lists jointly held securities and bank accounts having an aggregate value in excess of $260,000 as of the date of Mr. Haneke's death.

Included in Schedule G "Transfers During Decedent's Life" of the Federal Estate Tax Return, however, are certain bank accounts and U. S. Series E Savings Bonds having an aggregate value of $108,057.72, which are the subject matter of these proceedings. It is undisputed that these bank accounts and bonds represent assets originally aquired through the efforts of the decedent but which he had titled in his own and his wife's joint names.

---

1. "(a) The district courts shall have original jurisdiction, concurrent with the Court of Claims, of:

"(1) Any civil action against the United States for the recovery of any internal-revenue tax alleged to have been erroneously or illegally assessed or collected, or any penalty claimed to have been collected without authority or any sum alleged to have been excessive or in any manner wrongfully collected under the internal-revenue laws."

Virtually all of the U. S. Series E Saving Bonds referred to in Item 1 of Schedule G of the Return were acquired in monthly purchases, beginning about January 1, 1942, and ending about February, 1952, under payroll savings plans where Mr. Haneke was employed, first at the C & P Telephone Company, and later at the Baltimore Transit Company, although a very few were acquired by outside purchase. All of these savings bonds were acquired in the joint names of Mr. and Mrs. Haneke. On July 23, 1970, subsequent to the date of Mr. Haneke's admission to Armacost Nursing Home, Mrs. Haneke, on her own initiative and without consulting her husband, exchanged these U. S. Series E Savings Bonds for $56,000 in face amount of U. S. Savings Bonds of Series H. The Series H Bonds received in exchange were registered in the name of Mrs. Haneke alone, as sole owner. This was done by Mrs. Haneke at the suggestion of Mrs. Sullivan, the employee at the Federal Reserve Bank who handled the exchange. She suggested to Mrs. Haneke that the Series H Bonds be registered in Mrs. Haneke's name alone so that if anything happened to Mr. Haneke, they would not again require a change in registration. At her deposition, Mrs. Haneke testified that at the time of this transaction, she was contemplating her husband having an extended stay in the nursing home because of Parkinson's Disease. She further testified that she contemplated using the funds represented by the bonds to cover the expenses of the nursing home because she "didn't have enough money coming in without disturbing capital."

The history of the five savings accounts referred to in Item 2 of Schedule G of the Return is as follows:

On December 18, 1969, regular savings account No. 92406, hereinafter referred to as "Account # 1," in the name of "Mrs. Florence A. Haneke in trust for herself and Mrs. Mary C. Gorsuch joint owners, subject to order of either, the balance at death of either to belong to the survivor" was opened by Mrs. Haneke at Central Savings Bank, Baltimore, Maryland, with an original deposit of $5,000. This $5,000 had been withdrawn by Mrs. Haneke on that same date from Central Savings Bank regular savings account No. 55372, registered in the names of "August B. Haneke in trust for himself and Florence A. Haneke joint owners, subject to order of either, the balance at death of either to belong to the survivor." This latter account had originally been opened on February 4, 1953, and various sums of money were thereafter deposited into the account from time to time. Mrs. Gorsuch is Mr. Haneke's sister. Mrs. Haneke testified at her disposition that Account # 1 was opened at that time because Mr. Haneke was in the hospital and she was not well herself. She wished to assure that if anything happened to her, her sister-in-law would have access to funds to look after Mr. Haneke's welfare.

On December 31, 1969, "First Five" Passbook Account No. 98–012–00096, hereinafter referred to as "Account # 2," at First National Bank of Maryland, Baltimore, Maryland, in the name of "Mrs. Florence A. Haneke" was opened by Mrs. Haneke with an original deposit of $10,500. This sum of $10,500 had been, on that same date, withdrawn by Mrs. Haneke from regular savings account No. 12–29942 at First National Bank of Maryland registered in the names of "Mrs. Florence A. Haneke and Mr. August B. Haneke joint owners, subject to the order of either, the balance at the death of either to belong to the survivor." This latter account had been opened on May 13, 1968, with an original deposit of $10,000.

On April 17, 1970, Mrs. Haneke purchased Certificate of Deposit No. 81–1336 hereinafter referred to as "Account #3," of Baltimore Federal Savings and Loan Association, Baltimore, Maryland, in the amount of $12,000. This certificate is registered in the name of "Florence A. Haneke." This $12,000 represented the proceeds of a previous Certificate of Deposit registered in the joint names of August B. Haneke and Florence

A. Haneke, which had been purchased with the sum of $12,000 withdrawn on July 8, 1968 from Baltimore Federal Savings and Loan Association savings account No. 1–182995 registered in the names of "August B. Haneke in trust for himself and Florence A. Haneke as joint owners, subject to order of either, the balance at death of either to belong to the survivor." This latter account was originally opened with a deposit of $10,-000 on November 7, 1966.

On August 17, 1970, regular savings account No. 1–274830, hereinafter referred to as "Account #4," at Provident Savings Bank of Baltimore, Baltimore, Maryland, in the name of "Florence A. Haneke" was opened by Mrs. Haneke with an original deposit of $10,574.97. This sum on that same date, had been withdrawn by Mrs. Haneke from Provident Savings Bank savings account No. 1–270021 in the names of "Florence A. Haneke in trust for self and August B. Haneke joint owners, subject to the order of either, the balance at death of either to belong to the survivor." This latter account was opened with a $10,000 deposit on May 2, 1969, representing a portion of the proceeds from the sale of the residence property at St. Paul and Wendover Road, Baltimore, Maryland, the title to which had been held in the names of August B. Haneke and Florence A. Haneke, as tenants by the entireties. All funds used to make the original purchase of this residence were contributed by the decedent.

On October 2, 1970, savings account No. 59–90182, hereinafter referred to as "Account #5," at The Equitable Trust Company, Baltimore, Maryland, in the name of "Mrs. Florence A. Haneke" was opened by Mrs. Haneke with an original deposit of $13,982.75. This sum of $13,-982.75 had, on that same date, been withdrawn by Mrs. Haneke from The Equitable Trust Company savings account No. 59–90014, registered in the names of "Mrs. Florence A. Haneke in trust for herself and August B. Haneke joint owners, subject to the order of either, bal-

ance at the death of either to belong to the survivor." This latter account had been opened on April 17, 1969, with a deposit of $13,000, representing a portion of the proceeds from the aforesaid sale of the residence property at St. Paul and Wendover Road.

With respect to the five transfers of bank funds hereinabove referred to occurring on December 18, 1969; December 31, 1969; April 17, 1970; August 17, 1970; and October 2, 1970; each such transfer was made by Mrs. Haneke acting on her own initiative and without consulting her husband, August B. Haneke.

Except for the December 18, 1969 transfer to Account #1, when Mrs. Gorsuch's name was placed on the account for the reasons hereinabove set forth, and except for the exchange of the Series E Bonds for Series H Bonds which were placed in Mrs. Haneke's name alone at the suggestion of Mrs. Sullivan, Mrs. Haneke has no current recollection as to her reasons for making the transfers from joint names into her name alone.

When August B. Haneke died, virtually all of his estate consisted of jointly owned property and life insurance. His will was not admitted to probate and no administration proceedings were instituted.

Mrs. Haneke filed a federal estate tax return for the estate of her husband and made payment of the $36,135.79 of federal estate taxes shown to be due on the return. She filed a Claim for Refund with the Internal Revenue Service on June 11, 1973, asserting that the bonds and accounts should not be part of the estate for federal estate tax purposes, alleging that Mr. Haneke did not transfer the bonds and accounts to Mrs. Haneke in contemplation of his death and, accordingly, they were not properly includable in his estate under the provisions of section 2035, Internal Revenue Code of 1954 (Transactions in Contemplation of Death). The claim was not allowed and Mrs. Haneke instituted this

suit to recover the taxes paid with respect to the value of the bonds and accounts.

## II

Section 2035 of the Internal Revenue Code[2] sets forth the federal estate tax liability for transfers of property made in contemplation of death. Essentially, the statute sets out a rebuttable presumption that all transfers (except bona fide sales) made within three years of the decedent's death are made in contemplation of death and an irrebuttable presumption that all transfers made prior to three years before the decedent's death are not made in contemplation of death.

While all of the Series E Savings Bonds were acquired by the plaintiff and decedent prior to March 23, 1968, the date beginning the three-year period prior to the decedent's death, three of the five joint savings accounts which were the source of withdrawals by the plaintiff were opened within the three-year period. Accounts # 2, # 4, and # 5 were opened with funds withdrawn from joint accounts opened on May 13, 1968, May 2, 1969, and April 17, 1969, respectively.[3] However, all the property in controversy was removed from the joint form of ownership and placed in the plaintiff's own name within three years of the decedent's death.

The initial question to be resolved is the date as of which the transfers of the property in question were made for the purposes of § 2035. Plaintiff argues the court should view the transfers as having been made, for the purpose of § 2035, when the decedent placed the property in the joint names of himself and his wife because it was " . . . at [that] time he made the funds available to her."[4] Plaintiff cites *Wilson v. Commissioner*, 56 T.C. 579 (1971), in support of this proposition.

Reliance upon *Wilson* in support of this argument is misplaced, because the court in that case did not hold that a transfer of property for the purposes of § 2035 takes place at the time when said property is placed in the joint names of the donor and the donee, thereby making the property legally available for use by the donee without the necessity of accounting to the donor. On the contrary, *Wilson* held that as to such joint property still remaining in joint names at the date of death of the donor, the transfer or gift had not been completed since the donees had not exercised the right conferred upon them to withdraw the funds. Until that was done, reasoned the *Wilson* court, the decedent donor retained the right and the power to withdraw the funds. There was therefore no completed transfer or gift as to such property and it was properly included in decedent's gross estate as jointly held property

---

2. "Title 26, U.S.C. § 2035. Transactions in contemplation of death

   "*(a) General rule.*—The value of the gross estate shall include the value of all property to the extent of any interest therein of which the decedent has at any time made a transfer (except in case of a bona fide sale for an adequate and full consideration in money or money's worth), by trust or otherwise, in contemplation of his death.

   "*(b) Application of general rule.*—If the decedent within a period of 3 years ending with the date of his death (except in case of a bona fide sale for an adequate and full consideration in money or money's worth) transferred an interest in property, relinquished a power, or exercised or released a general power of appointment, such trans-

fer, relinquishment, exercise, or release shall, unless shown to the contrary, be deemed to have been made in contemplation of death within the meaning of this section and sections 2038 and 2041 (relating to revocable transfers and powers of appointment) ; but no such transfer, relinquishment, exercise, or release made before such 3-year period shall be treated as having been made in contemplation of death."

3. The court treats Account #3 as being opened with funds withdrawn from a joint account opened on November 7, 1966, because the certificate of deposit purchased on July 8, 1968, also was placed in joint names.

4. Plaintiff's trial brief, p. 11.

under the provisions of 26 U.S.C. § 2040.[5]

As to such joint property which had been withdrawn or used by the donee prior to the death of the donor, but within three years of said death, Wilson held that "the gift was not completed"[6] until the date upon which the donee had exercised dominion and control over the property by withdrawing the funds from the joint bank account and thereby ending the right and power theretofore retained by the donor to use the funds as well. *Wilson,* properly read, does not stand for the proposition that a transfer under § 2035 dates back to its inception, rather than to its completion.[7]

Even if *Wilson* had held otherwise, this court would have respectfully disagreed. For the purpose of determining the date as of which a transfer has taken place of a decedent's interest in property under § 2035, one must logically look to the date the transfer was completed, not the date it was initiated. Section 2035 does not concern itself initially with what a transferee received but with what a decedent transferor relinquished.

In other words, § 2035 does not come into play until there has been a complete relinquishment of an interest in property by the decedent. The type of transfer contemplated by § 2035 is not accomplished until the decedent transferor has completely relinquished an interest in property. If the decedent transferor has merely created a joint interest in property by giving the transferee a right to hold, possess, or use the property while retaining a similar right in himself, the death of the decedent prior to the complete relinquishment of the property by the transferor triggers the operation of § 2040, not § 2035.

While not dispositive, it is significant that such an interpretation of the intent of § 2035, the "transfer in contemplation of death" statute, is consistent with the regulations established under § 2511(a),[8] which imposes a tax on *inter vivos* transfers of property. The Treasury Regulations for § 2511(a)[9] state in relevant part:

"(b) As to any property, or part thereof or interest therein, of which the donor has so parted with dominion and control as to leave in him no power to change its disposition, whether for his own benefit or for the benefit of another, the gift is complete. But if upon a transfer of property (whether in trust or otherwise) the donor reserves any power over its disposition, the gift may be wholly incomplete, or may be partially complete and partially incomplete, depending upon all the facts in the particular case. Accordingly, in every case of a transfer of property subject to a reserved power, the terms of the power must be examined and its scope determined.

"\* \* \*

"(c) A gift is incomplete in every instance in which a donor reserves the power to revest the beneficial title to the property in himself.

"\* \* \* \*"

---

5. Title 26, U.S.C., § 2040 reads in pertinent part as follows:

   "§ 2040. Joint interests

   "The value of the gross estate shall include the value of all property to the extent of the interest therein held as joint tenants by the decedent and any other person, or as tenants by the entirety by the decedent and spouse, or deposited, with any person carrying on the banking business, in their joint names and payable to either or the survivor, except such part thereof as may be shown to have originally belonged to such other person and never to have been received or acquired by the latter from the decedent for less than an adequate and full consideration in money or money's worth . . . ."

6. *Wilson v. Commissioner, supra,* at 587.

7. *Wilson, supra,* does go on to hold that the motives and intent of the decedent in such a factual situation for the purposes of § 2035 must be viewed as of the date of the inception of the transfer rather than of its completion. For reasons set out in Part III of this opinion, I disagree.

8. Title 26, U.S.C., § 2511(a).

9. Title 26, C.F.R., § 25.2511–2.

■■ The date of completion of the transfer, rather than the date of its inception, is, therefore, the date from which the three-year period is measured to invoke the presumptions of § 2035. All of the transfers of property here involved were completed within three years prior to the death of Mr. Haneke. As a result, the rebuttable presumption created by § 2035 that the transfers were made in contemplation of death applies.

### III

Plaintiff next argues that the motive of the donor at the time the monies were deposited in a joint account or invested in jointly held bonds is dispositive in determining whether or not the transfers were in contemplation of death, again citing *Wilson v. Commissioner, supra.* While *Wilson* appears so to hold, this court respectfully disagrees with plaintiff's position.

As was explicated in Part II hereof, § 2035 is activated only at the time of a *completed* transfer. Consequently, the logical focal point for determining the donor's motives and potential estate tax liability under § 2035 is this same point in time.

Under the factual situation generally present in the creation of a joint bank account or on the titling of jointly held bonds, subject to the order of either joint tenant, the act of creating the bank account or so titling the bonds, in actuality, is the beginning of a continuing offer to allow the potential donee to act as the doner's *alter ego* to decide when and for what reason the gift is to be completed, in the absence of other action by the donor. Under such circumstances, evidence of the motive of the donee at the time the donee, pursuant to the power granted by the donor, ended the joint holding of the property and completed the transfer by exercising full and sole dominion and control over it, to the exclusion of the donor, is probative of the intent of the donor at that same time.

Conummation of a gift through the medium of a joint bank account or joint-ly held bonds, subject to the order of either, requires concerted action by both the donor and donee. By creating such interests, the donor creates a right and power in the donee to make a gift to himself of all or part of the property. The gift, however, is not completed and § 2035 is not activated unless and until the donee exercises his right by making a withdrawal and reducing the funds to his own possession. Under these circumstances, it is not unreasonable to expect that the motives of the donee in completing the gift are similar to those of the donor in then empowering completion by not himself ending the jointly held relationship. This presumption of similar motives appears especially justified where a mutuality of interest exists with respect to the financial affairs of the parties to the joint account, such as in the case at bar where the parties are husband and wife.

Furthermore, from a policy point of view, it is desirable to find the donee's motives probative of the donor's motives at the time of the completion of the transfer. Such a finding tends to avoid the illogical and statutorily unintended result of a donee being able to avoid federal estate tax liability by simply withdrawing the funds on the day before the donor dies.

This is not to say that evidence of the donor's intent at the time of creation of the joint interest in the property may not also be probative of his intent at the time of the completion of the transfer. It is quite possible that the intent of a donor at the time of the creation of the joint interest could continue and exist at the time that the donee completed the transfer by taking sole possession of the theretofore jointly held property, particularly where the time intervening between the two events is short. As the time between the events increases, however, the likelihood decreases that the original intent of the donor was the same as his intent at the time of the completion of the transfer.

In all events, the intent which is to be measured is that of the donor and the time as of which it is measured is the date of the completion of the transfer. But in the circumstance here, where there is no direct evidence of the intent of the donor at the time of the completion of the transfer; where the time between the inception of the transfer and the completion thereof is not less than 14 months and where there is no issue as to the credibility of the donee, it is logical and reasonable to look to the facts at the time of completion of the gift, including the facts relating to the intent of the donee at the time, since the donor has given the donee the power to make the decision for him as to when, and under what circumstances, to complete the transfer or gift.

The concept of the measurement of the intent of one person by the intent of another person for the purposes of § 2035 is not entirely foreign to the administration of the Internal Revenue Code. IRS Revenue Ruling 56–408 [10] states:

"Where, under the laws of a community property state, the husband, as the managing member of the community, may make valid gifts of the community property to third persons, the value of one-half of any such gifts made by the husband in contemplation of his wife's death is includible in her gross estate to the extent provided in section 2035 of the Internal Revenue Code of 1954. In making such gifts, the husband, in effect, acts as agent of his wife as to her one-half community interest in the property. See *City Bank Farmers Trust Co. v. McGowan*, 323 U.S. 594, 65 S.Ct. 496, 89 L.Ed. 483."

## IV

The burden of proof is upon the plaintiff to show by a preponderance of the evidence that the transfers of property here in question were not made in contemplation of the death of the donor.

*Wickwire v. Reinecke*, 275 U.S. 101, 48 S.Ct. 43, 72 L.Ed. 184 (1927); *Detroit Bank & Trust Co. v. United States*, 369 F.Supp. 672 (E.D.Mich.1974). As has been stated:

"In cases under § 2035, the proper inquiry is whether, when the transfer in question was made, the dominant motive of the decedent was a life motive or a death motive. 'Phrased somewhat differently, the question is whether the decedent made this gift for a purpose which would reasonably be effected during the life of the decedent, or is the gift a substitute for a testamentary disposition.'"

*Detroit Bank & Trust Co. v. United States, supra,* at 676, quoting *Lockwood v. United States*, 181 F.Supp. 748, 750 (S.D.N.Y., 1958). *See also United States v. Wells*, 283 U.S. 102, 51 S.Ct. 446, 75 L.Ed. 867 (1931).

As to the Series E Savings Bonds, the evidence indicates a long established practice by the decedent, beginning in 1942 and ending in 1952, of acquiring these bonds primarily under payroll savings plans in the joint names of him and his wife. This practice was carried out as a matter of convenience and as a reflection of their attitude that all of their property, in effect, belonged to both of them. For the purpose of determining whether a gift to a particular person is made in contemplation of death, a long-term policy or pattern of making gifts to that person indicates a life associated motive on the part of the donor. *Landorf v. United States,* 408 F.2d 461, 187 Ct.Cl. 99 (1969); *Skall v. United States*, 355 F.Supp. 778 (N.D.Ohio, 1972); *Estate of Johnson*, 10 T.C. 680 (1948). The long-term policy of the decedent with respect to the bonds was not inconsistent with a life associated motive on his part at the time his wife completed the gift by exchanging the bonds. Furthermore, the plaintiff stated during her deposition that she completed the gift of the bonds to provide funds

10. 1956–7 Cum.Bull. 600.

to meet the expenses of the decedent's expected continued stay in a nursing home. This motive is associated with the continued life of the decedent rather than his death. The defendant has not challenged the plaintiff's explanation for exchanging the bonds nor has it offered contrary evidence. In the absence of evidence or inferences to the contrary, under the circumstances here it is reasonable to impute the motives of the donee to the decedent for the reasons previously set forth. Therefore, with respect to the savings bonds, the plaintiff has rebutted the statutory presumption and shown a motive associated with life by a preponderance of the evidence.

■ For similar reasons, the court finds the decedent had a motive associated with life with respect to the funds used to open Account #1, a joint account in the names of the plaintiff and her sister-in-law. This account was created by depositing therein money which had been withdrawn from a joint account opened more than 18 years prior to the decedent's death in the names of the decedent and the plaintiff. The undisputed testimony of the plaintiff at her deposition was that she opened Account #1 because she wished to assure that if anything happened to her, her sister-in-law would have access to funds to look after the welfare of Mr. Haneke who was then in a nursing home. The plaintiff's motive, then, as to Account #1 was associated with the continued life of Mr. Haneke, the decedent. For the same reasons as have been previously expressed with reference to the bonds, the court, therefore, finds the plaintiff has

met her burden as to the funds placed in Account #1.

■ The remaining bank accounts, Accounts #2 through #5, were opened with funds withdrawn from joint accounts opened no earlier than November 7, 1966. As to Accounts #2 through #5, the plaintiff testified in her deposition that she had no current recollection as to her reasons for making the transfers from joint names into her name alone. Although the joint accounts used to fund Accounts #2 through #5 were placed in joint ownership by the decedent over many years in accord with his long-term policy, that policy in itself does not negative the potential inference that the reason for the specific transfers giving rise to Accounts #2 through #5 was to avoid the estate tax which would have been payable under § 2040 in the event of the death of Mr. Haneke, who was admittedly very ill. Neither is there any explanation by the donee, Mrs. Haneke, which rebuts the presumption created by § 2035 that the transfers were made in contemplation of the death of Mr. Haneke. Therefore, the court finds that the plaintiff has failed to rebut the statutory presumption that the decedent empowered completion of the transfers to Accounts #2 through #5 in contemplation of his death.

V

■ The defendant has presented the alternative argument that the value of the saving accounts [11] should be included in the decedent's gross estate under § 2040 of the estate tax code.[12]

11. The defendant concedes that because the Treasury Regulations applicable to savings bonds operate to divest the decedent of any property interest in the Series E Savings Bonds after their redemption on July 23, 1970, these bonds cannot be included in his estate under § 2040. 31 C.F.R. § 315.60; *United States v. Chandler*, 410 U.S. 257, 93 S.Ct. 880, 35 L.Ed.2d 247 (1973).

12. The joint accounts from which withdrawals were made to open Accounts #4 and #5 were opened with funds "representing a portion of the proceeds from the sale of the residence

property at St. Paul and Wendover Road, Baltimore, Maryland, the title to which had been held in the names of August B. Haneke and Florence A. Haneke, as tenants by the entireties." (Plaintiff's Answers to Interrogatories 2(a)). Plaintiff has neither argued nor attempted to prove that a part of these proceeds represent Mrs. Haneke's independent contribution to the joint accounts. See Treasury Regulations § 20.2040-1(c) Ex. 5; *Harvey v. United States*, 185 F.2d 463 (7th Cir., 1950); *Cf. Endicott Trust Co. v. United States*, 305 F.Supp. 943 (N.D.N.Y., 1969). Since the burden is on the plaintiff to estab-

Although on its face, § 2040 does not appear applicable to the property in question, the defendant argues that the plaintiff's withdrawals from the five joint savings accounts did not alter their joint tenancy character, citing *Harold W. Grant v. Commissioner*, 1 T.C. 731 (1943) in support of this argument.

In *Grant, supra,* three days before her husband's death, the decedent's wife withdrew funds from a joint bank account which had been created by the deposit of the husband's funds. The court applied the law of California, the domicile of the decedent and his wife, to determine the property interest of the decedent after the withdrawal. The court stated the following with respect to California law (quoting from *Wallace v. Riley,* 23 Cal.App.2d 654, 74 P.2d 807, 813):

> "Contrary to the rule of the common law (which was applied in New York to a joint tenancy account in *Estate of Suter,* 258 N.Y. 104, 179 N.E. 310), it has become the established principle in California that, if money is taken from a joint tenancy account during the joint lives of the depositors, property acquired by the money so withdrawn, or another account into which the money is traced, will retain its character as property held in joint tenancy like the original fund, unless there has been a change in the character by some agreement between the parties."

Finding no agreement between the parties, the court held that the joint tenancy continued to exist after the withdrawal and, therefore, the property was taxable under § 2040.

■ It has long been established that what constitutes an interest in property for deciding how the federal estate tax law is to be applied is a matter of state law. *Greer v. United States,* 448 F.2d 937 (4th Cir. 1971). Under Maryland law, either joint tenant of a jointly owned bank account may withdraw all the funds, thereby severing the tenancy and defeating the interest of the cotenant. *Scott, Adm'x v. Bowman,* 253 Md. 55, 58, 251 A.2d 598 (1969). Therefore, *Grant* does not support the defendant's position.

■ The defendant argues, however, that the interest was not defeated in this case because of the plaintiff's statement in her deposition that, as to Accounts #2 through #5, her husband still "had a right" to the funds in those accounts after she made the withdrawals. While it is true that Mrs. Haneke did make such a statement, a full reading of the transcript of the deposition makes it clear that she realized and intended that she solely would be in control of those accounts and that her husband would have no actual control whatsoever. (Dep.Tr. 19–20).[13]

Viewed in context, the statement of the plaintiff perhaps evidenced her intent to use the funds, at least in part, for the care and benefit of her husband, but demonstrated no intent to retain the money in joint ownership and control. "Under [§ 2040] it is only 'the value of property held jointly *at the time* of decedent's death' that is includable" (emphasis in original). *Glaser v. United States,* 306 F.2d 57, 60 (7th Cir. 1962), citing Treas.Reg., sec. 20.2040–1. *See also United States v. Heasty,* 370 F.2d 525, 528 (10th Cir. 1966).

At the time of the decedent's death, Accounts #1 through #5 were not held in joint tenancy; therefore the funds in those accounts are not taxable under § 2040.

---

lish by a preponderance of the evidence that the decision of the Internal Revenue Service was erroneous (*Russell v. United States,* 38 F.Supp. 438, 93 Ct.Cl. 675 (1941)), the court will treat these joint accounts as being opened by funds contributed exclusively by Mr. Haneke.

13. With respect to the savings bond transfers, plaintiff testified that she subsequently made a will because she wanted to assure that in the case of her death, they would then pass to her husband.

For the foregoing reasons, it is the opinion of the court that the decedent's gross estate should not include the value of the Series H Savings Bonds and Account #1, but should include the value of Accounts #2 through #5. The plaintiff is entitled to an appropriate refund.

Upon presentation by counsel, the court will sign an order in accord with this opinion.

## MEMORANDUM AND ORDER

█ The Government has moved this court, pursuant to Rule 52(b) of the Federal Rules of Civil Procedure, to amend the Findings of Fact and Conclusions of Law contained in the Memorandum Opinion of September 22, 1975. The motion is based upon the ground that the record allegedly does not reasonably support the exclusion of the U. S. Savings Bonds at issue in the case from the estate of the plaintiff's decedent. For the reasons given below, the court denies the motion.

The court, in accord with plaintiff's explanation, found that the plaintiff completed the gift of the Series E bonds, by exchanging them for Series H bonds in her own name, to meet the expenses of the decedent's expected continued stay in a nursing home. Upon submission of this case for the court's determination upon the record without a trial, the Government did not then challenge this explanation for exchanging the bonds nor did it offer contrary evidence. The thrust of the Government's argument is now that this finding is inconsistent with the fact that Series H bonds cannot be redeemed until six months after their issue date (31 C.F.R. § 332.2(d)). While the fact that the Series H bonds could not be redeemed for six months is material, it is not of such overwhelming significance under the facts of this case to require that the Government's motion be granted.

The factual issue before the court, insofar as applicable to the pending motion, was intent of the donor at the time of the completion of the transfer of the bonds from jointly held Series E bonds to solely held Series H bonds. As explicated in detail in the Memorandum Opinion, the intent of the donor under the circumstances of this case was authoritatively measured by the intent of the donee, Mrs. Haneke.

Assuming Mrs. Haneke was aware of the regulation, her motive as previously determined by the court is not necessarily inconsistent with it.

First, the six-month period during which redemption cannot be effected is not unduly long when one considers that Series E bonds, normally considered a rather liquid form of asset, has a similar non-redemption period of two months (31 C.F.R. § 315.35(d)).

Second, plaintiff testified that she anticipated that the decedent would experience a long drawn out illness requiring a lengthy stay in a nursing home (tr. 16). She may well have contemplated this stay would be substantially in excess of six months. She categorically testified that there was not any thought in her mind at the time she transferred from the Series E to the Series H bonds in July, 1970 of getting the assets out of Mr. Haneke's estate (tr. 16). The credibility of Mrs. Haneke was not challenged by the Government. There is nothing in the record to require the court to disregard Mrs. Haneke's testimony. She could have believed that she had sufficient other assets and income to meet the anticipated long term expenses of her husband's illness until at least January, 1971, and she could also have found in January, 1971, that she need not cash the Series H bonds for several months more. While the fact the Series H bonds tended to reduce her liquidity weakens her stated reasons for her action, it does not annihilate them.

Third, Series E bonds are appreciation bonds and must be redeemed to realize any increase in value (31 C.F.R. § 315.30(a)). Series H bonds are current income bonds on which interest is

payable semiannually by check drawn to the order of the person in whose name the bond is inscribed (31 C.F.R. § 315.-30(b) and § 315.32(b)). Thus, it is not necessarily inconsistent with her testimony that the plaintiff desired to obtain income from the bonds through the automatic interest payments which could help her defer the day when capital would have to be used to meet her husband's nursing home expenses. While Mrs. Haneke may not have made the wisest choice of investments to accomplish her stated purpose, that fact does not nevertheless require a finding that her purpose was not as she stated it.

Finally, the court does not find determinative the fact that Mrs. Haneke still has the Series H bonds. Her husband died in March, 1971, which ended her stated reason for needing additional income and to "invade capital." There was no obligation on her to carry through with her original plans when the reason for those plans had disappeared.

Accordingly, it is this 20th day of October, 1975, Ordered that defendant's motion to amend the Opinion in this case be, and the same is hereby, Denied.